**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Edward HANOUSEK, Jr., Defendant–
Appellant.**

No. 97–30185.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 4, 1998.

Decided March 19, 1999.

Bruce E. Gagnon, Atkinson, Conway & Gagnon, Anchorage, Alaska, and Brian M. Doherty, Gilmore & Doherty, Anchorage, Alaska, for the defendant-appellant.

Ellen J. Durkee, United States Department of Justice, Washington, D.C., for the plaintiff-appellee.

Before: THOMPSON and TASHIMA, Circuit Judges, and STAGG, District Judge.*

DAVID R. THOMPSON, Circuit Judge:

Edward Hanousek, Jr., appeals his conviction and sentence for negligently discharging a harmful quantity of oil into a navigable water of the United States, in violation of the Clean Water Act, 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3). Hanousek contends that the district court erred: (1) by failing to instruct the jury that the government must prove that he acted with criminal negligence as opposed to ordinary negligence, (2) by failing to instruct the jury that he could not be found vicariously liable, (3) by failing to instruct the jury properly on causation, and (4) by incorrectly applying the United States Sentencing Guidelines.

Hanousek also argues that section 1319(c)(1)(A) violates due process if it permits a criminal conviction for ordinary negligence and that, in any event, the evidence was insufficient to support his conviction. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

---

* Honorable Tom Stagg, Senior United States District Judge for the Western District of Louisiana, sitting by designation.

## FACTS

Hanousek was employed by the Pacific & Arctic Railway and Navigation Company (Pacific & Arctic) as roadmaster of the White Pass & Yukon Railroad, which runs between Skagway, Alaska, and Whitehorse, Yukon Territory, Canada. As roadmaster, Hanousek was responsible under his contract "for every detail of the safe and efficient maintenance and construction of track, structures and marine facilities of the entire railroad ... and [was to ] assume similar duties with special projects."

One of the special projects under Hanousek's supervision was a rock-quarrying project at a site alongside the railroad referred to as "6–mile," located on an embankment 200 feet above the Skagway River. The project was designed to realign a sharp curve in the railroad and to obtain armor rock for a ship dock in Skagway. The project involved blasting rock outcroppings alongside the railroad, working the fractured rock toward railroad cars, and loading the rock onto railroad cars with a backhoe. Pacific & Arctic hired Hunz & Hunz, a contracting company, to provide the equipment and labor for the project.

At 6–mile, a high-pressure petroleum products pipeline owned by Pacific & Arctic's sister company, Pacific & Arctic Pipeline, Inc., runs parallel to the railroad at or above ground level, within a few feet of the tracks. To protect the pipeline during the project, a work platform of sand and gravel was constructed on which the backhoe operated to load rocks over the pipeline and into railroad cars. The location of the work platform changed as the location of the work progressed along the railroad tracks. In addition, when work initially began in April, 1994, Hunz & Hunz covered an approximately 300–foot section of the pipeline with railroad ties, sand, and ballast material to protect the pipeline, as was customary. After Hanousek took over responsibility for the project in May, 1994, no further sections of the pipeline along the 1000–foot work site were protected, with the exception of the movable backhoe work platform.

On the evening of October 1, 1994, Shane Thoe, a Hunz & Hunz backhoe operator, used the backhoe on the work platform to load a train with rocks. After the train departed, Thoe noticed that some fallen rocks had caught the plow of the train as it departed and were located just off the tracks in the vicinity of the unprotected pipeline. At this location, the site had been graded to finish grade and the pipeline was covered with a few inches of soil. Thoe moved the backhoe off the work platform and drove it down alongside the tracks between 50 to 100 yards from the work platform. While using the backhoe bucket to sweep the rocks from the tracks, Thoe struck the pipeline causing a rupture. The pipeline was carrying heating oil, and an estimated 1,000 to 5,000 gallons of oil were discharged over the course of many days into the adjacent Skagway River, a navigable water of the United States.

Following an investigation, Hanousek was charged with one count of negligently discharging a harmful quantity of oil into a navigable water of the United States, in violation of the Clean Water Act, 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3). Hanousek was also charged with one count of conspiring to provide false information to United States Coast Guard officials who investigated the accident, in violation of 18 U.S.C. §§ 371, 1001.[1]

1. The government also charged M. Paul Taylor, an officer of Arctic & Pacific and Arctic & Pacific Pipeline, Inc., with one count of negligently discharging a harmful quantity of oil into a navigable water in violation of 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3), one count of failing to report a discharge in violation of 33 U.S.C. § 1321(b)(5), one count of conspiracy to make false statements in violation of 18 U.S.C. §§ 371, 1001, five counts of making false statements in violation of 18 U.S.C. § 1001, and one count of obstructing justice. In the joint trial with Hanousek, the jury acquitted Taylor of all charges except two counts of making false statements in violation of 18 U.S.C. § 1001.

After a twenty-day trial, the jury convicted Hanousek of negligently discharging a harmful quantity of oil into a navigable water of the United States, but acquitted him on the charge of conspiring to provide false information. The district court imposed a sentence of six months of imprisonment, six months in a halfway house and six months of supervised release, as well as a fine of $5,000. This appeal followed.

## DISCUSSION

### A. Negligence Jury Instruction

Hanousek contends the district court erred by failing to instruct the jury that, to establish a violation under 33 U.S.C. § 1319(c)(1)(A), the government had to prove that Hanousek acted with criminal negligence, as opposed to ordinary negligence, in discharging a harmful quantity of oil into the Skagway River. In his proposed jury instruction, Hanousek defined criminal negligence as "a gross deviation from the standard of care that a reasonable person would observe in the situation." *See* American Law Institute, *Model Penal Code* § 2.02(2)(d) (1985). Over Hanousek's objection, the district court instructed the jury that the government was required to prove only that Hanousek acted negligently, which the district court defined as "the failure to use reasonable care."

■ Whether the jury instruction provided by the district court misstated an element of 33 U.S.C. § 1319(c)(1)(A) presents a question of statutory interpretation, which we review de novo. *See United States v. Weitzenhoff,* 35 F.3d 1275, 1283 (9th Cir.1993).

■ Statutory interpretation begins with the plain language of the statute. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). If the language of the statute is clear, we need look

no further than that language in determining the statute's meaning. *See United States v. Lewis,* 67 F.3d 225, 228 (9th Cir.1995). "Particular phrases must be construed in light of the overall purpose and structure of the whole statutory scheme." *Id.* at 228–29. "When we look to the plain language of a statute in order to interpret its meaning, we do more than view words or sub-sections in isolation. We derive meaning from context, and this requires reading the relevant statutory provisions as a whole." *Carpenters Health & Welfare Trust Funds v. Robertson (In re Rufener Constr.),* 53 F.3d 1064, 1067 (9th Cir.1995).

Codified sections 1319(c)(1)(A) & 1321(b)(3) of the Clean Water Act work in tandem to criminalize the conduct of which Hanousek was convicted. Section 1319(c)(1)(A) provides that any person who negligently violates 33 U.S.C. § 1321(b)(3) shall be punished by fine or imprisonment, or both.[2] Section 1321(b)(3) proscribes the actual discharge of oil in harmful quantities into navigable waters of the United States, adjoining shore lines or waters of a contiguous zone, as well as other specified activity.

■ Neither section defines the term "negligently," nor is that term defined elsewhere in the CWA. In this circumstance, we "start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used." *Russello v. United States,* 464 U.S. 16, 21, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (quoting *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962)). The ordinary meaning of "negligently" is a failure to use such care as a reasonably prudent and careful person would use under similar circumstances. *See Black's Law Dictionary* 1032 (6th ed.1990); *The Ran-*

---

**2.** 33 U.S.C. § 1319(c)(1)(A) provides that first-time negligent violators shall be punished by a fine of not less than $2,500 nor more than $25,000 per day of violation, or by imprisonment for not more than one year, or by both.

The same statute provides that second-time negligent violators shall be punished by a fine of not more than $50,000 per day of violation, or by imprisonment of not more than two years, or both.

*dom House College Dictionary* 891 (Rev. ed.1980).

■ If Congress intended to prescribe a heightened negligence standard, it could have done so explicitly, as it did in 33 U.S.C. § 1321(b)(7)(D). This section of the CWA provides for increased civil penalties "[i]n any case in which a violation of [33 U.S.C. § 1321(b)(3) ] was the result of gross negligence or willful misconduct." 33 U.S.C. § 1321(b)(7)(D). This is significant. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello,* 464 U.S. at 23, 104 S.Ct. 296 (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972)).

■ Hanousek argues that Congress could not have intended to distinguish "negligently" in 33 U.S.C. § 1319(c)(1)(A) from "gross negligence" in 33 U.S.C. § 1321(b)(7)(D) because the phrase "gross negligence" was only recently added to the statute in 1990. *See* Oil Pollution Control Act of 1990, Pub.L. No. 101–380, 104 Stat. 484 (1990). We reject this argument because Congress is presumed to have known of its former legislation and to have passed new laws in view of the provisions of the legislation already enacted. *See United States v. Trident Seafoods Corp.,* 92 F.3d 855, 862 (9th Cir.1996), *cert. denied,* 519 U.S. 1109, 117 S.Ct. 944, 136 L.Ed.2d 833 (1997).

■ We conclude from the plain language of 33 U.S.C. § 1319(c)(1)(A) that Congress intended that a person who acts with ordinary negligence in violating 33 U.S.C. § 1321(b)(3) may be subject to criminal penalties.[3] We next consider Hanousek's argument that, by imposing an ordinary negligence standard for a criminal violation, section 1319(c)(1)(A) violates the due process clause of the Constitution.

**B. Due Process**

■ We review de novo whether a statute violates a defendant's right to due process. *See United States v. Savinovich,* 845 F.2d 834, 838–39 (9th Cir.1988).

The criminal provisions of the CWA constitute public welfare legislation. *See Weitzenhoff,* 35 F.3d at 1286 ("The criminal provisions of the CWA are clearly designed to protect the public at large from the potentially dire consequences of water pollution, *see* S.Rep. No. 99–50, 99th Cong., 1st Sess. 29 (1985), and as such fall within the category of public welfare legislation."). Public welfare legislation is designed to protect the public from potentially harmful or injurious items, *see Staples v. United States,* 511 U.S. 600, 607, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), and may render criminal "a type of conduct that a reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health or safety," *see Liparota v. United States,* 471 U.S. 419, 433, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985).

■ It is well established that a public welfare statute may subject a person to criminal liability for his or her ordinary negligence without violating due process. *See United States v. Balint,* 258 U.S. 250, 252–53, 42 S.Ct. 301, 66 L.Ed. 604 (1922) ("[W]here one deals with others and his mere negligence may be dangerous to them, as in selling diseased food or poison, the policy of the law may, in order to stimulate proper care, require the punishment of the negligent person though he be ignorant of the noxious character of what he sells."); *see also Morissette v. United States,* 342 U.S. 246, 256, 72 S.Ct. 240, 96 L.Ed. 288 (1952) ("The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsi-

---

**3.** In light of our conclusion that 33 U.S.C. § 1319(c)(1)(A) unambiguously permits criminal penalties for ordinary negligence, the rule

of lenity has no application. *See Staples v. United States,* 511 U.S. 600, 619 n. 17, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994).

bilities."); *United States v. Dotterweich,* 320 U.S. 277, 281, 64 S.Ct. 134, 88 L.Ed. 48 (1943) ("In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger."); *Staples,* 511 U.S. at 607 n. 3, 114 S.Ct. 1793 (reiterating that public welfare statutes may dispense with a "mental element").

Recognizing that our holding in *Weitzenhoff* would defeat his due process argument, Hanousek attempts to distinguish *Weitzenhoff.* The attempt fails. In *Weitzenhoff,* two managers of a sewage treatment plant operating under a National Pollution Discharge Elimination System permit were convicted of knowingly discharging pollutants into a navigable water of the United States, in violation of 33 U.S.C. §§ 1311(a) & 1319(c)(2). *See Weitzenhoff,* 35 F.3d at 1282–83. In rejecting the defendants' contention that the district court erred by failing to instruct the jury that the government had to prove that the defendants knew their acts violated the permit or the CWA, we held that the criminal provisions of the CWA constitute public welfare legislation and that the government was not required to prove that the defendants knew their conduct violated the law. *See id.* at 1286. We explained that, "[w]here ... dangerous or deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation." *See id.* at 1284 (quoting *United States v. International Minerals & Chem. Corp.,* 402 U.S. 558, 565, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971)).

Hanousek argues that, unlike the defendants in *Weitzenhoff* who were permittees under the CWA, he was simply the roadmaster of the White Pass & Yukon railroad charged with overseeing a rock-quarrying project and was not in a position to know what the law required under the CWA. This is a distinction without a difference. In the context of a public welfare statute, "as long as a defendant knows he is dealing with a dangerous device of a character that places him 'in responsible relation to a public danger,' he should be alerted to the probability of strict regulation." *Staples,* 511 U.S. at 607, 114 S.Ct. 1793 (quoting *Dotterweich,* 320 U.S. at 281, 64 S.Ct. 134). Although Hanousek was not a permittee under the CWA, he does not dispute that he was aware that a high-pressure petroleum products pipeline owned by Pacific & Arctic's sister company ran close to the surface next to the railroad tracks at 6–mile, and does not argue that he was unaware of the dangers a break or puncture of the pipeline by a piece of heavy machinery would pose. Therefore, Hanousek should have been alerted to the probability of strict regulation. *See id.*[4]

■ In light of our holding in *Weitzenhoff* that the criminal provisions of the CWA constitute public welfare legislation, and the fact that a public welfare statute may impose criminal penalties for ordinary negligent conduct without offending due process, we conclude that section 1319(c)(1)(A) does not violate due process by permitting criminal penalties for ordinary negligent conduct.

### C. Vicarious Liability Jury Instruction

■ Hanousek next contends that the district court erred by failing to instruct the jury that he could not be found vicariously liable for the negligence of Shane Thoe, the Hunz & Hunz backhoe operator.

■ We review de novo whether a district court's instructions adequately cover a defense theory. *See United States v. Mason,* 902 F.2d 1434, 1438 (9th Cir.1990). We will affirm a district court's refusal to give an otherwise proper theory-of-defense

---

4. Although Hanousek argues that "the harsh penalties that may be imposed for violations of § 1319(c)(1) are another indication that the law of 'public welfare' offenses should not be applicable," this argument was rejected in *Weitzenhoff. See Weitzenhoff,* 35 F.3d at 1286 n. 7.

instruction if the instructions actually given, in their entirety, adequately cover the defense theory. *See id.*

The first of Hanousek's proposed instructions dealing with vicarious liability reads as follows:

> You are instructed that Defendant Edward Hanousek is not responsible for and cannot be held criminally liable for any negligent acts or omissions by Shane Thoe or other Hunz & Hunz personnel.

Hanousek also requested a more general instruction that "a person is responsible under the criminal law only for acts he performs or causes to be performed on behalf of a corporation."

The district court rejected Hanousek's proposed instructions without explanation. However, the district court did instruct the jury as follows:

> In order for the defendant Ed Hanousek to be found guilty of negligent discharge of oil, the government must prove the following elements beyond a reasonable doubt:
>
> 1. The particular defendant caused the discharge of oil;
> 2. The discharge of oil was into a navigable waterway of the United States;
> 3. The amount of oil was of a quantity that may be harmful; and
> 4. The discharge was caused by the negligence of the particular defendant.

We conclude that the district court's instructions adequately explained to the jury that Hanousek could be convicted only on the basis of his own negligent conduct and not on the basis of the negligence of others working at 6–mile. *See United States v. Chen,* 933 F.2d 793, 796 (9th Cir.1991) (stating that we consider the jury instructions as a whole and consider how they will be reasonably understood by the jury). Accordingly, the district court's failure to provide Hanousek's proposed instructions on vicarious liability does not constitute reversible error.

▇▇▇▇ In a related argument, Hanousek argues that the district court erred by allowing the government to strike "foul blows" during closing argument by inviting the jury to convict Hanousek on a theory of vicarious liability. We disagree. In the course of closing argument, the prosecutor stated, "[w]hen Shane Thoe hit that unprotected pipeline and that oil fired out of that pipeline, sprayed up into the air, and got into that Skagway River, these two defendants are guilty of negligent discharging [oil] into the Skagway River." The prosecutor also told the jury that "the buck stops" with Hanousek and M. Paul Taylor, an officer of both Arctic & Pacific and Arctic & Pacific Pipeline, Inc. When read in context, the prosecutor was appropriately arguing to the jury that Hanousek and Taylor failed to adequately protect the pipeline and that both should be held responsible for their negligent conduct. *See United States v. Prantil,* 764 F.2d 548, 555 (9th Cir.1985) (stating that the district court must allow the prosecution the freedom to strike "hard blows" based on the evidence and all fair inferences drawn therefrom).

### D. Causation Jury Instruction

▇▇▇▇ To establish the element of causation, the government must prove beyond a reasonable doubt that the defendant's conduct was both the cause in fact and the proximate cause of the harm. *See United States v. Spinney,* 795 F.2d 1410, 1415 (9th Cir.1986). To prove proximate cause, the government must establish that the harm was a foreseeable result of the conduct. *See United States v. Main,* 113 F.3d 1046, 1049 (9th Cir.1997). In the context of an involuntary manslaughter prosecution, we recently stated:

> All of the authorities agree that to be guilty of involuntary manslaughter the harmful result must be within the risk foreseeably created by the accused's conduct; if the physical causation is too remote, the law will not take cognizance of it. *"The same result has been achieved by requiring that the accused's conduct be a substantial factor in caus-*

*ing the harmful result or that it be the proximate, primary, direct, efficient, or legal cause of such harmful result."*

*Id.* (quoting Charles E. Torcia, *Wharton's Criminal Law* § 26 at 148–151 (1993) (emphasis added)).

Hanousek contends that the district court's causation instruction failed to sufficiently inform the jury that, to find Hanousek guilty under 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3), the accident must have been within the risk foreseeably created by Hanousek's conduct.

The district court gave the jury the following instruction on causation:

> In order to prove that a particular defendant caused the negligent discharge of oil as alleged in Count 1 of the indictment, the government must prove beyond a reasonable doubt that:
>
> 1. The particular defendant's conduct had a direct and substantial connection to the discharge; and
>
> 2. The discharge would not have occurred but for the particular defendant's conduct.

Hanousek did not object to this instruction, but asked that the following instruction, taken directly from *Model Penal Code* § 2.03(3), also be given:

> The element of causation is not established if the actual result is not within the risk of which the particular defendant was aware or should have been aware, unless:
>
> (a) the actual result differs from the probable result only in the respect that a different person or different property is injured or affected or that the probable injury or harm would have been more serious or more extensive than that caused; or
>
> (b) the actual result involves the same kind of injury or harm as the probable result and is not too remote or accidental in its occurrence to have a just bearing on the actor's liability or on the gravity of his offense.

The district court properly declined to provide the jury with the additional instruction Hanousek requested. The causa-

tion instruction given by the district court was adequate under *Main.* It required the jury to find that Hanousek's conduct had a "direct and substantial connection" to the discharge of oil. That was sufficient. *See United States v. Warren,* 25 F.3d 890, 895–96 (9th Cir.1994) ("A court may reject portions of a proposed theory of defense that merely rephrase explanations of the law adequately covered elsewhere in the instructions.").

### E. Sufficiency of the Evidence

Although Hanousek did not list sufficiency of the evidence as one of the issues in his briefs, he nevertheless included in his opening and reply briefs an extensive discussion of the evidence and argued that the evidence was insufficient to support his conviction. The government responded to this argument in its brief, and both sides at oral argument argued the issue of whether the evidence was sufficient to support Hanousek's conviction. Because the issue has been presented in this way by the parties, and fully argued, we consider it.

We review the evidence in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See United States v. Lennick,* 18 F.3d 814, 818 (9th Cir.1994).

The government presented evidence at trial that Hanousek was responsible for the rock-quarrying project at 6-mile; that the project involved the use of heavy equipment and machinery along the 1000-foot work site; that Hanousek directed the daily activities of Hunz & Hunz employees and equipment; and that it was customary to protect the pipeline with railroad ties and fill when using heavy equipment in the vicinity of the pipeline. The government also presented evidence that when work initially began in April, 1994, Hunz & Hunz covered an approximately 300-foot section of the pipeline with rail-

road ties, sand, and ballast material to protect the pipeline; that after Hanousek took over responsibility for the project in May, 1994, no further sections of the pipeline along the work site were protected; and that the section of the pipeline where the rupture occurred was not protected with railroad ties, sand or ballast. Finally, the government presented evidence that although the rock quarrying work had been completed in the location of the rupture, rocks would sometimes fall off the loaded railroad cars as they proceeded through the completed sections of the work site; that no policy prohibited the use of backhoes off the work platform for other activities; that a backhoe operator ruptured the unprotected pipeline while using a backhoe to remove a rock from the railroad tracks; and that a harmful quantity of oil was discharged into the Skagway River.

The totality of this evidence is sufficient to support Hanousek's conviction for negligently discharging a harmful quantity of oil into a navigable water of the United States, in violation of 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3).

## F. Sentencing

Based on an offense level of 12 and a criminal history category of I, the district court sentenced Hanousek to 6 months in prison, 6 months in a halfway house, and 6 months of supervised release.

### 1. Upward Adjustment for Supervisory Role

 Hanousek contends that the district court erred by making a two-point upward adjustment under United States Sentencing Guidelines § 3B1.1(c) based on his role as a supervisor in a criminal activity. We disagree.

Pursuant to U.S.S.G. § 3B1.1, the district court may make an upward adjustment if the defendant supervised one or more participants. *See United States v. Cyphers,* 130 F.3d 1361, 1363 (9th Cir. 1997). A participant is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." *Id.* (quoting U.S.S.G. § 3B1.1 Application Note 1). Here, the district court did not clearly err by finding that Hanousek was a supervisor because, although the backhoe operator was not prosecuted, he was nonetheless a participant in the criminal activity, and Hanousek supervised the project at 6–mile.

### 2. Sentencing Form

Hanousek correctly notes that the sentencing form attached to the final judgment contains "mathematical errors" because it erroneously indicates that the imprisonment range for an offense level of 12 is up to 6 months (the actual range is 10 to 16 months, *see* U.S.S.G. Ch. 5 Pt. A) and that the supervised release range is up to 6 years (the maximum term of supervised release for a misdemeanor (other than a petty offense) is 1 year, *see* 18 U.S.C. § 3583(b)(3)). However, these errors were clerical and did not play a role in Hanousek's sentencing. At the sentencing hearing, the district court correctly stated that the guideline for an offense level of 12 was 10 to 16 months, and the district court imposed only 6 months of supervised release, well under the one-year maximum.

### 3. U.S.S.G. § 5C1.1(d)

United States Sentencing Guideline § 5C1.1(d) provides:

> If the applicable guideline range is Zone C of the Sentencing Table, the minimum term may be satisfied by—
> (1) a sentence of imprisonment; or
> (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in subsection (e), provided that at least one-half of the minimum term is satisfied by imprisonment.

Hanousek contends that, in imposing sentence, the district court relied on incor-

rect information from the probation officer that, under U.S.S.G. § 5C1.1(d), the entire minimum sentence had to be served as a term of imprisonment. We disagree. The probation officer did originally advise the district court incorrectly that the entire minimum sentence had to be served as a term of imprisonment. However, after the district court questioned the probation officer's reading of the guideline, the probation officer corrected herself by saying, "One-half of the minimum term could be served in imprisonment. I'm sorry." The district court did not rely on incorrect information.

### 4. Departures

■ We lack jurisdiction to review the district court's refusal to depart downward from the Sentencing Guidelines. *See United States v. Webster,* 108 F.3d 1156, 1158 (9th Cir.1997). The district court recognized that it had the discretion to make the departures requested by Hanousek, but chose not to do so. *See id.*

### CONCLUSION

In light of the plain language of 33 U.S.C. § 1319(c)(1)(A), we conclude Congress intended that a person who acts with ordinary negligence in violating 33 U.S.C. § 1321(b)(3) may be subjected to criminal penalties. These sections, as so construed, do not violate due process. Accordingly, the district court properly instructed the jury on ordinary negligence. We also conclude that the district court properly instructed the jury on causation and did not err by refusing to provide the jury with Hanousek's proposed jury instructions on vicarious liability. Finally, the evidence was sufficient to support Hanousek's conviction, and the district court properly imposed its sentence under the Sentencing Guidelines.

AFFIRMED.[5]

---

**5.** Judge Stagg intends to file a separate dis- senting opinion.