[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
07/23/99
THOMAS K. KAHN
CLERK

_____

No. 98-8532

_____

D. C. Docket No. 2:96-CV-175-WCO


DAVID & BARBARA DRISCOLL, and
RUEL & PATRICIA GALBREATH,

Plaintiffs-Appellants,

versus

ROSS ADAMS,

Defendant-Appellee.


_____

Appeal from the United States District Court
for the Northern District of Georgia

_____
**(July 23, 1999)**

Before EDMONDSON and CARNES, Circuit Judges, and WATSON*, Senior
Judge.

CARNES, Circuit Judge:

_____

*Honorable James L. Watson, Senior Judge for the U.S. Court of International Trade,
sitting by designation.

Plaintiffs David and Barbara Driscoll and Ruel and Patricia Galbreath appeal the district court's award of summary judgment to defendant Ross Adams on their Clean Water Act claim, which arose out of Adams' discharge of allegedly polluted stormwater into a stream running from his property to ponds on their properties. Adams argues that the district court was correct in concluding that he is not subject to liability under the Clean Water Act because the Act imposed an impossible condition by requiring him to obtain a discharge permit that was unavailable in the state of Georgia. He also maintains that his discharge falls outside the scope of the Act because it was not a point source discharge of a pollutant into a navigable water as defined by the Act. We reject both of those arguments and reverse the district court's grant of summary judgment.

## I. FACTS AND PROCEDURAL HISTORY

At all times relevant to this case, Adams owned 76 acres of land in the North Georgia mountains. David and Barbara Driscoll owned approximately five acres adjacent to Adams' property, and Ruel and Patricia Galbreath owned about two acres adjacent to the Driscolls' property. The Spiva Branch stream flows downhill from Adams' property through a pond on the Driscolls' property and then through another pond on the Galbreaths' property, before merging with the Nottely River, which flows across the Georgia-Tennessee border and unites with the Tennessee River. The

Driscolls and Galbreaths claim in their complaint, and the magistrate judge found, that stormwater washed mud, silt, sand, and other materials from Adams' property into the Spiva Branch stream and thence into the plaintiffs' two ponds while Adams was harvesting timber and developing his property.

Adams harvested timber on his property from March 1995 to November 1995. During the harvest, he cut and graded roads, installed storm pipes, and cut and removed timber. Adams then proceeded to develop the property, putting gravel on the roads, building culverts and check dams to channel the stormwater runoff, and dividing the property into residential lots for vacation homes. The harvest and development caused erosion of mud, sand, and other materials on his property. Adams concedes that he did little to stabilize his property or prevent erosion until the spring of 1996, after the erosion had already caused a considerable amount of damage to the plaintiffs' properties. He says his delay in taking preventive measures was the result of inclement weather and winter cold.

Adams failed to seek the proper approval from any federal, state, or local government agency before starting to work on his property. After all of the timber harvest and much of the development were already completed, he filed for the required state permit in September 1996. He did not obtain a county development permit until February 1997, two months after the filing of the complaint in this lawsuit. As for

3

federal law requirements, Adams never obtained a National Pollutant Discharge Elimination System ("NPDES") permit, which is required for lawful pollutant discharge under the Clean Water Act. The parties agree that an NPDES general stormwater permit was not available because of a legal challenge to the permit. The plaintiffs contend, however, that other NPDES permits were available, including an individual stormwater permit and both general and individual point source discharge permits.

The plaintiffs filed this lawsuit in December 1996 against Adams for violations of the Clean Water Act, 33 U.S.C. §§ 1251-1376 (1994), pursuant to its citizen suit provision, 33 U.S.C. § 1365. They also included in their complaint pendent state law claims for nuisance, trespass, and negligence, among other things. They filed a motion for summary judgment, and Adams filed a motion to dismiss, which the district court treated as a cross motion for summary judgment. The court denied the plaintiffs' motion and granted Adams', stating that the requirement of an "NPDES permit was an impossible condition . . . [and] [t]here were no approved federal standards for how much sand, silt and mud could be in the released water." After disposing of the federal law claim, the court declined to retain supplemental jurisdiction over the state law claims and dismissed them without reaching the merits. The plaintiffs appealed.

We review de novo the district court's award of summary judgment.  See B.R.L. Equip. Rentals Ltd. v. Seabring Marine Indus., Inc., 168 F.3d 413, 415 (11th Cir. 1999).  We also review de novo the district court's conclusions of law.  See Brooks v. Miller, 158 F.3d 1230, 1236 (11th Cir. 1998).

## II. DISCUSSION

Adams raises essentially two issues on appeal.  First, he argues that the Clean Water Act's prohibition on pollutant discharge does not apply where the NPDES permit required to make the discharge lawful under the Act is not available.  Second, he contends that his discharges in this case did not fall within the scope of prohibited pollutant discharges under the Act.  We will address each contention in turn.

A.  DOES THE CLEAN WATER ACT'S PROHIBITION ON "THE DISCHARGE OF ANY POLLUTANT BY ANY PERSON" APPLY WHERE THE NPDES PERMIT REQUIRED FOR LAWFUL DISCHARGE IS NOT AVAILABLE?

The Clean Water Act provides, "Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful."   33 U.S.C. § 1311(a).  Of the excepted sections, the only one potentially applicable in this case is § 1342, which establishes the National Pollutant Discharge Elimination System and authorizes the Administrator of the EPA to issue permits under this system that allow the permit holder to discharge limited quantities of pollutants under prescribed conditions.   See 33 U.S.C. §

5

1342(a)(1). If the Administrator approves a state's permit program, the state may assume control of NPDES permitting for that jurisdiction. See 33 U.S.C. § 1342(b).

Georgia has an approved state NPDES permit program. Pursuant to that program, the Georgia Environmental Protection Division ("EPD") has attempted several times over the past few years to issue a general NPDES stormwater discharge permit. Unlike an individual permit, which would apply to an individual discharger, the general permit would apply to an entire class of dischargers. To obtain coverage under a general permit, a would-be discharger could file a Notice of Intent form with the EPD. The EPD has been unable to implement any of its proposed general stormwater permits because of court challenges brought by concerned citizens. Thus, the general NPDES stormwater discharge permit is not and never has been available.

The plaintiffs argued in their briefs to us that although the general stormwater discharge permit was not available to Adams, other acceptable NPDES permits, including an individual stormwater discharge permit and both general and individual point source discharge permits, were available. Their counsel conceded at oral argument, however, that nothing in the record supports their contention that the EPD had ever actually issued any individual NPDES stormwater discharge permits in

6

Georgia. The record is equally devoid of any evidence suggesting that other general or individual NPDES point source discharge permits for stormwater discharge were being issued in Georgia.

Thus, the issue in this case is whether § 1311(a)'s zero-discharge standard applies to a discharger who could not obtain an NPDES permit because none was available. This Court has previously addressed the implications of an unavailable NPDES permit under the Clean Water Act. We did so in Hughey v. JMS Development Corp., 78 F.3d 1523 (11th Cir. 1996), where the plaintiff sued developer JMS under the Clean Water Act for discharging stormwater without an NPDES permit. See Hughey, 78 F.3d at 1524. The discharge was minimal, because JMS had implemented state-of-the-art sedimentation control devices in accordance with all state and local requirements. See id. at 1526. JMS had not obtained the required NPDES permit, however, because it was not available from the Georgia EPD. See id. at 1525.

In order to determine whether JMS had violated the Clean Water Act, we began our analysis with the text of the Act, concluding that "[t]he amended CWA absolutely prohibits the discharge of any pollutant by any person, unless the discharge is made according to the terms of [an NPDES] permit." See id. at 1524. But our commitment to the plain language of the Act was tempered by the well-established canon that

"Congress is presumed not to have intended absurd (impossible) results." Id. at 1529. In an effort to strike a balance, we established a narrow exception to the general rule of liability for discharges without an NPDES permit where: 1) compliance with the zero-discharge standard was factually impossible because there would always be some stormwater runoff from an area of development; 2) there was no NPDES permit available to cover such discharge; 3) the discharger was in good-faith compliance with local pollution control requirements, which substantially mirrored the proposed NPDES discharge standards; and 4) the discharges were minimal. See id. at 1530. Thus, while acknowledging the Clean Water Act's zero-discharge standard, the Hughey decision, in light of the material facts of that case, recognizes a narrow exception to that standard for any minimal discharge that occurs despite a developer's best efforts to reduce the amount of it and comply with applicable law. See id. We made it clear that all four of the elements were essential to the exception. See id.

Two of the Hughey elements are lacking in this case. First, unlike the discharger in Hughey, who had "made every good-faith effort to comply with the Clean Water Act and all other relevant pollution control standards" by implementing pollution-control measures and obtaining local permits, id., in this case Adams did little or nothing to limit erosion or stormwater discharge before beginning construction. He sought none of the required permits until after considerable damage had been done to the Driscolls'

8

and Galbreaths' properties. Second, we emphasized in Hughey that "[t]he facts of this case necessarily limit our holding to situations in which the stormwater discharge is minimal, as it was here." Id. By contrast, in this case the amount of Adams' stormwater discharge and the resulting damage were substantial. Indeed, the plaintiffs proffered evidence indicating that approximately 64 tons of sediment were deposited into their ponds as a result of Adams' activities. The factual disparities between Hughey and this case compel the conclusion that the exception recognized in Hughey does not apply here.

Adams argues that even if the Hughey exception does not apply, the Clean Water Act should not be interpreted to impose a default zero-discharge standard where no NPDES permit is available. He contends, in essence, that if the Act is interpreted as requiring a discharge permit which cannot be obtained, then the law requires an impossibility, with the net result being there is no restriction on his right to discharge. That contention is inconsistent with the Hughey opinion and our understanding of the law.

We agree with Hughey that, but for the limited exception recognized in that case, "[t]he amended CWA absolutely prohibits the discharge of any pollutant by any

9

person, <u>unless</u> the discharge is made according to the terms of [an NPDES] permit."[1]

Id. at 1524. That decision staked out a path developers wishing to avoid liability can follow where no permit is available and where it would otherwise be impossible to develop their land without causing some discharge: the developer must be in good-faith compliance with all state and local requirements prior to any discharge and must reduce the discharge to a minimum. See id. at 1530. Because it is feasible for a developer to take the steps required to qualify for the Hughey exception – after all, the developer in that case took them – Adams' impossibility argument fails.

We note that our reading in Hughey of the Clean Water Act as prohibiting (with one narrow exception) all discharges without a permit is consistent with a Fifth Circuit decision published almost contemporaneously with Hughey. In Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc., 73 F.3d 546 (5th Cir. 1996), the Sierra Club sued

---

[1]Several other courts also have concluded, albeit not in the context of administratively unavailable permits, that obtaining a permit is the only way a discharger can avoid violating the Act. See, e.g., E.P.A. v. California ex rel. State Water Resources Control Bd., 426 U.S. 200, 205, 96 S. Ct. 2022, 2025 (1976) ("Under the NPDES, it is unlawful for any person to discharge a pollutant without obtaining a permit and complying with its terms."); Natural Resources Defense Council, Inc. v. Costle, 568 F.2d 1369, 1375-76 (D.C. Cir. 1977) ("There are innumerable references in the legislative history [of the Clean Water Act] to the effect that the Act is founded on the 'basic premise that a discharge of pollutants without a permit is unlawful and that discharges not in compliance with the limitations and conditions for a permit are unlawful.' Even when infeasibility arguments were squarely raised, the legislature declined to abandon the permit requirement." (quoting 118 Cong. Rec. 10215 (1972))).

Cedar Point Oil under the citizen suit provision of the Clean Water Act, alleging that Cedar Point's discharges of produced water (a by-product of oil and gas drilling which consists of water and chemicals used in the drilling process) into Galveston Bay without an NPDES permit violated the Clean Water Act. See Sierra Club, Lone Star Chapter, 73 F.3d at 550-51. The EPA had never issued a permit for produced water discharges or promulgated specific effluent limitations for the "Coastal Subcategory" of oil and gas producers, to which Cedar Point belonged. See id. at 552-53. Cedar Point argued that because of the EPA's failure in that regard, it could not be liable for violating the Clean Water Act. See id. at 559.

The Fifth Circuit rejected Cedar Point's position. Like we did in Hughey, the Fifth Circuit observed that the plain language of the Clean Water Act imposes liability for discharges without a permit and facially admits of no exception where the required permit is not available. See id. The court went on to examine the legislative history of the Act, concluding that the history supported its interpretation of the text. The court stated:

> We agree with Cedar Point that Congress initially intended that a citizen suit based on a violation of § 1311(a) for discharging pollutants without a permit would only lie where EPA had issued a relevant effluent limitation or permit; that is, where the defendant was discharging pollutants without a permit because he had failed to obtain a permit that was available, rather than because EPA had failed to issue such permits. This intent is clearly established by the inclusion of particular dates in the statute, as explained by the legislative history.

11

Id. at 559-60.  The court determined, however, that Congress did not intend for the unavailability of an NPDES permit to excuse discharges indefinitely.   Congress provided that the citizen suit provision would become effective almost nine months after enactment of the Clean Water Act, in order to allow "sufficient time . . . for the State and Federal governments to develop fully, and execute the authority contained in [§ 1342, which provides for NPDES permits]."  Id. at 560 & n.27 (quoting S. Rep. No. 414, 92d Cong., 1st Sess. 81 (1971)) (emphasis omitted).  Because that effective date and others have long since passed, and Congress has not postponed them or placed any other restrictions on bringing suit, the court concluded it would defeat Congressional intent to extend those dates indefinitely.  See id. at 560-61.

The Fifth Circuit's decision in Sierra Club, Lone Star Chapter reinforces  our interpretation of the Clean Water Act in Hughey.  For the reasons set forth in those two decisions, we reject Adams' position that the Clean Water Act's zero-discharge standard does not apply where the required NPDES permit is not available.[2]  We decline to extend the narrow exception recognized in Hughey to cover the circumstances presented in this case.

_____

[2]In reaching this conclusion, we decline Adams' invitation to adopt the Seventh Circuit's decision in Stream Pollution Control Board of the State of Indiana v. United States Steel Corp., 512 F.2d 1036 (7th Cir. 1975).

## B. DID ADAMS' DISCHARGES FALL WITHIN THE SCOPE OF PROHIBITED POLLUTANT DISCHARGES UNDER THE CLEAN WATER ACT?

Adams also contends that this court should affirm the district court's award of summary judgment to him for two additional reasons. First, he argues that the material he discharged into the Spiva Branch stream was not a "pollutant" under the Clean Water Act. Second, he contends there was no "discharge of a pollutant" within the meaning of the Act, both because the stormwater runoff did not come from a "point source," and because the Spiva Branch stream, being a small-volume stream that flows only intermittently, is not a navigable water. These two contentions are without merit.

As to the first one, the definition of "pollutant" in the Act is broad, including, among other things, "rock, sand, cellar dirt and industrial, municipal, and agricultural waste. . . ." 40 C.F.R. § 122.2. Sand and silt were two of the primary constituents of the sediment deposited in the plaintiffs' ponds as a result of the runoff from Adams' property. Moreover, the <u>Hughey</u> court specifically held that "[w]hen rain water flows from a site where land disturbing activities have been conducted, such as grading and clearing, it falls within this description." <u>Hughey</u>, 78 F.3d at 1525 n.1.

As to Adams' second contention, a "point source" includes "any discernible, confined and discrete conveyance, including but not limited to, any pipe, ditch,

13

channel, tunnel, conduit" and so on. 40 C.F.R. § 122.2. Here, it is undisputed that Adams collected stormwater by pipes and other means, and that the stormwater was discharged into the stream. Furthermore, the Spiva Branch stream is a "navigable water" within the meaning of the Act. In United States v. Eidson, 108 F.3d 1336 (11th Cir. 1997), we described the expansive reach of the term "navigable waters" as follows:

> The CWA [Clean Water Act] defines "navigable waters" as "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). This broad definition "makes it clear that the term 'navigable' as used in the Act is of limited import" and that with the CWA Congress chose to regulate waters that would not be deemed navigable under the classical understanding of that term. . . . Consequently, courts have acknowledged that ditches and canals, as well as streams and creeks, can be "waters of the United States" under § 1362(7). Likewise, there is no reason to suspect that Congress intended to exclude from "waters of the United States" tributaries that flow only intermittently.

Eidson, 108 F.3d at 1341-42 (holding that a man-made drainage ditch was a navigable water under the Clean Water Act) (citations omitted). Thus, the Spiva Branch stream is a "navigable water" under the Clean Water Act, even if it flows only intermittently.

### III. CONCLUSION

We REVERSE both the district court's award of summary judgment to Adams and the denial of summary judgment to the plaintiffs on the Clean Water Act claim, VACATE the district court's dismissal of the state law claims, and REMAND for further proceedings consistent with this opinion.