**F I L E D**
**Tenth Circuit**
**November 1, 2005**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellant,

v.

DAVID ENRIQUE ORTIZ,

      Defendant-Appellee.

No. 04-1228

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 03-CR-113-M)**

---

Patricia W. Davies, Assistant U.S. Attorney, Denver, Colorado (William J. Leone, Acting United States Attorney, James C. Murphy, Assistant U.S. Attorney, Denver, Colorado and Linda Kato, Regional Criminal Enforcement Counsel, U.S. EPA, Region 8, Denver, Colorado with her on the briefs) for the Plaintiff-Appellant.

Virginia L. Grady, Assistant Federal Public Defender, Denver, Colorado (Raymond P. Moore, Federal Public Defender, Denver, Colorado and John T. Carlson, Assistant Federal Public Defender, Denver, Colorado with her on the brief) for the Defendant-Appellee.

---

Before **BRISCOE**, **BRORBY,** and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

After a jury convicted David Ortiz of violating the Clean Water Act by negligently discharging a pollutant into the Colorado River, the district court entered a judgment of acquittal. The court ruled as a matter of law that an individual is not guilty of negligently discharging a pollutant unless he knows that the pollutant's path terminates in protected water. This conclusion is at odds with the plain language of the Clean Water Act, which criminalizes any act of ordinary negligence that leads to the discharge of a pollutant into the navigable waters of the United States. We therefore **REVERSE** the district court's judgment of acquittal.

## I

When reviewing a judgment of acquittal, this court must view the evidence in the light most favorable to the government. United States v. McClatchey, 217 F.3d 823, 829 (10th Cir. 2000). Construed in this manner, the evidence adduced at trial presents the following facts.

Chemical Specialties, Inc. operates a propylene glycol distillation facility in Grand Junction, Colorado where David Ortiz served as the Grand Junction facility's operations manager and sole employee. The process of distilling propylene glycol, an airplane wing de-icing fluid, produces significant amounts of wastewater. At the optimum mixture, the distillation of 1,000 gallons of used propylene glycol generates 500 gallons of industrial wastewater. Propylene glycol

distillation enterprises typically discharge such wastewater to a municipal waste treatment plant for processing. Chemical Specialties, however, specifically declined to obtain a permit to discharge its industrial wastewater to Grand Junction's pretreatment plant and instead represented to city officials that it would ship all of its wastewater to a nearby business.

Grand Junction currently operates a bifurcated sewage system consisting of a wastewater treatment plant fed by numerous sanitary sewer lines and a storm water drainage system that collects rain water and distributes it into the Colorado River. Prior to the early 1990s, the city maintained a combined sewer line directing both waste and rain water to the treatment plant. In segregating its combined line into sanitary sewer lines and storm drains after the early 1990s, Grand Junction overlooked sewer service line connections in the area near Chemical Specialties, with the effect that since the early 1990s all sanitary discharges from Chemical Specialties and surrounding businesses flowed into a storm drain that discharged into the Colorado River.

In late April 2002, the city received a complaint of a noxious odor near the Colorado River, and subsequent investigation revealed a black substance accompanied by a pungent odor described as being reminiscent of onions pouring from a storm drain outfall and seeping into the river. City employees traced the malodorous black substance upstream along the storm drain and took samples en

- 3 -

route.  The samples were found to contain propylene glycol and propionaldehyde, a breakdown constituent of propylene glycol.

On May 1st, a city official accompanied by an employee of the Colorado Department of Public Health and Environment met with Ortiz at Chemical Specialties.  After informing Ortiz that they were investigating the source of an unusual odor downstream from Chemical Specialties, Ortiz insisted that he sent all of his wastewater to a nearby business.  Six days later, after discovering more of the black discharge downstream from Chemical Specialties and none upstream, the two officials returned and told Ortiz that the substance appeared to be coming from his facility.  Specifically, they told Ortiz that black fine material reeking like onions was spilling into the Colorado River, that the officials had traced it through the storm drain, and that it seemed to be emanating from Chemical Specialties.  They asked Ortiz if the facility had discharged any wastewater. Again, Ortiz said no.  Dubious, the officials sought and received permission to inspect the facility, whereupon they observed significant amounts of water on the bathroom floor and several hoses and pumps lying nearby.  On inspection of the grounds behind the facility, the officials detected the same onion odor.  They also observed a large canvas bag containing a black granular substance, which Ortiz identified as carbon used in the distillation process.

During a follow-up investigation on May 29th, a city employee collected samples from the storm drain downstream from Chemical Specialties and from a pool of water below the storm drain flapper gate. Analysis revealed propylene glycol in the samples. Because earlier investigation had ruled out surrounding businesses as the likely source of the discharges, officials turned their attention exclusively to Chemical Specialties. On June 6th, a city employee conducted a test that conclusively demonstrated a connection between the toilet in Chemical Specialties and the storm sewer. The city employee informed Ortiz that the toilet was definitely connected to the storm drain and instructed Ortiz not to discharge anything down the toilet or sink. In their words, officials "shut the water off" at Chemical Specialties and arranged for a portable toilet and handwash station to be delivered to the facility.

On June 18th, two EPA special agents were dispatched to Chemical Specialties where they discovered a tanker truck spewing a liquid with "a fermenting type of smell that comes off of [wet onions]" onto the ground at the facility. The agents then walked to the nearby storm drain outfall where yet again a black liquid with the stench of rotten onions was observed pouring into the Colorado River. Although the storm drain downstream from Chemical Specialties had the same smell, immediately upstream from the facility the storm drain was dry and odorless. Returning to Chemical Specialties, the agents interviewed Ortiz

who informed them that the leaking tanker contained propylene glycol that Ortiz intended to process. Ortiz stated that he was the sole employee of Chemical Specialties, and volunteered that he was the only person with a key to the facility. When asked if he had ever discharged pollutants through the toilet, Ortiz refused to answer. City investigators again observed puddles of water on the bathroom floor and hoses lying nearby, and noted that water supply to the toilet had been turned back on and the toilet was operational.

On submission of the case to a federal grand jury, a superseding indictment was returned charging Ortiz with two violations of the Clean Water Act ("CWA"): (1) negligently discharging chemical pollutants from a point source (a storm drain) into waters of the United States (the Colorado River) without a permit on May 29, 2002 and (2) knowingly discharging chemical pollutants from a point source into waters of the United States without a permit on June 18, 2002. Having been convicted on both counts on trial to a jury, Ortiz filed a motion for judgment of acquittal. The district court denied the motion as to Count Two but granted it as to Count One, finding: "There is no evidence that the defendant had any awareness that the toilet was not connected to a sanitary sewer line before June 6, 2002. While the first count of the Superseding Indictment charges a negligent discharge, the defendant could not be guilty on that discharge in the absence of his knowledge that using the toilet would result in the discharge . . . to

the river." At sentencing, the court declined to apply an enhancement for an "ongoing, continuous or repetitive discharge" pursuant to U.S.S.G. § 2Q1.3(b)(1)(A), and also denied the government's requested enhancement for a "discharge without a permit" under U.S.S.G. § 2Q1.3(b)(4). Ortiz received a sentence of twelve months' imprisonment. The government appeals the judgment of acquittal on Count One and the court's decision denying the two requested enhancements.

**II**

"This court gives no deference to a district court's decision to set aside a jury's guilty verdict and grant a defendant's post-verdict motion for judgment of acquittal." McClatchey, 217 F.3d at 829. Rather, we review a defendant's motion for judgment of acquittal de novo. In deciding whether a district court erred in entering a judgment of acquittal, we review the evidence submitted at trial in the light most favorable to the government and "determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." Id. Because the district court misinterpreted the statute of conviction, and because sufficient evidence supports the jury's guilty verdict, we reverse the judgment of acquittal and reinstate Ortiz's conviction for negligently discharging a pollutant in violation of the CWA, 33 U.S.C. §§ 1311(a) and 1319(c)(1)(A).

## A

The CWA prohibits the discharge of any pollutant into the navigable waters of the United States without a National Pollution Discharge Elimination System ("NPDES") permit. 33 U.S.C. § 1311(a); see also Driscoll v. Adams, 181 F.3d 1285, 1289 (11th Cir. 1999) ("the amended CWA absolutely prohibits the discharge of any pollutant by any person, unless the discharge is made according to the terms of [an NPDES] permit."). To enforce strict compliance with its terms, the CWA provides penalties not only for individuals who knowingly violate the statute, 33 U.S.C. § 1319(c)(2)(A), but also for any person who negligently discharges a pollutant in derogation of the NPDES. 33 U.S.C. § 1319(c)(1)(A) ("any person who negligently violates [section 1311] shall be punished"); see also United States v. Wilson, 133 F.3d 251, 262 (4th Cir. 1997) (discussing the legislative history of the CWA). As the court below properly instructed the jury, an individual commits a crime by (1) negligently, (2) discharging, (3) a pollutant, (4) from a point source, (5) into the navigable waters of the United States, (6) without a permit.

In granting Ortiz's motion for a judgment of acquittal of negligent discharge, the district court found that "the defendant could not be guilty on that discharge in the absence of his knowledge that using the toilet would result in the discharge . . . to the river." On appeal, the government argues that the court

improperly imposed a mens rea requirement, and effectively conflated the elements required for a negligent discharge conviction under § 1319(c)(1)(A) and a knowing discharge conviction under § 1319(c)(2)(A). It continues with the assertion that the CWA does not saddle the government with the burden of proving that a defendant knew that waste traversed some boustrophedonic path and ended in a navigable stream. Ortiz does not dispute that ordinary negligence suffices to establish a negligent discharge violation under § 1319(c)(1)(A). Rather, Ortiz characterizes the court's judgment of acquittal as resting on the recognition "that one cannot be negligent, that is, flout a known risk, without being aware of what that risk is." Appellee's Br. at 12. Because Ortiz claims that he had no reason to suspect on May 29th that his toilet was connected to the storm drain, he argues that he cannot have been negligent in flushing dangerous chemicals down his toilet.

Even though the CWA does not define the term "negligently," we can easily determine what the government must prove to obtain a conviction under § 1319(c)(1)(A) by applying straightforward principles of statutory interpretation. We begin with the plain language of the statute. Duncan v. Walker, 533 U.S. 167, 172 (2001). "When the meaning of the statute is clear, it is both unnecessary and improper to resort to legislative history to divine congressional intent." Edwards v. Valdez, 789 F.2d 1477, 1481 (10th Cir. 1986). When confronted with clear and

unambiguous statutory language, our duty is simply to enforce the statute that Congress has drafted.  See Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A., 530 U.S. 1, 6 (2000) ("When the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms.").

Section 1319(c)(1)(A) imposes punishment upon "any person who negligently violates" certain enumerated sections of the CWA.  Those enumerated sections include § 1311(a), which states that "the discharge of any pollutant by any person shall be unlawful" except "as in compliance with this section and sections 302, 306, 307, 318, 402, and 404 of this Act."  To determine what "negligently" means in this statutory context, we "start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used." Russello v. United States, 464 U.S. 16, 21 (1983).  In its ordinary usage, "negligently" means a failure to exercise the degree of care that someone of ordinary prudence would have exercised in the same circumstance.  See Hodgson v. Dexter, 5 U.S. (1 Cranch) 345 (1803) ("negligence means the want of ordinary care."); Sinclair Prairie Oil Co. v. Thornley, 127 F.2d 128, 131 (10th Cir. 1942) (approving the following instruction: "A common definition of negligence is that it consists of the failure to do what a person of ordinary prudence and care would do under the circumstances of a particular or given situation, or in doing

something which such a person would not have done under those circumstances."). Under the statute's plain language, an individual violates the CWA by failing to exercise the degree of care that someone of ordinary prudence would have exercised in the same circumstance, and, in so doing, discharges any pollutant into United States waters without an NPDES permit. Thus, contrary to the district court's reading, the CWA does not require proof that a defendant knew that a discharge would enter United States waters. See W. Page Keeton, Prosser and Keeton on Torts § 31 (5th ed. 1984) ("Negligence is conduct, and not a state of mind. In most instances, it is caused by heedlessness or inadvertence, by which the negligent party is unaware of the results which may follow from his act.").

Our decision accords with the Ninth Circuit's ruling in United States v. Hanousek, 176 F.3d 1116 (9th Cir. 1999), the only case to have previously addressed this issue. In Hanousek, the court upheld the conviction of a railroad project supervisor under § 1319(c)(1)(A) where he failed to cover an oil pipeline near the project site with protective materials and one of his workers accidently ruptured the pipeline with a backhoe, causing oil to spill into a nearby river. On appeal, Hanousek argued that to establish a violation under § 1319(c)(1)(A), the government had to prove that the defendant acted with criminal negligence rather than ordinary negligence. Viewing the plain language of the statute, the court

- 11 -

disagreed, and held that one commits a negligent discharge violation by failing "to use such care as a reasonably prudent and careful person would use under similar circumstances." Id. at 1120. Further, the court determined that "[i]f Congress intended to prescribe a heightened negligence standard, it could have done so explicitly, as it did in 33 U.S.C. § 1321(b)(7)(D)," a civil penalty provision of the CWA. Id. at 1121; see also Russello v. United States, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

If Ortiz failed to exercise the degree of care that someone of ordinary prudence would have exercised in the same circumstance and, in so doing, discharged a pollutant into the Colorado River without a permit to do so, then he violated § 1319(c)(1)(A). Ortiz does not dispute on appeal that on May 29, 2002 he discharged some amount of propylene glycol wastewater down the toilet at Chemical Specialties. He does not deny that the wastewater flowed into the Colorado River and does not claim to have a permit to discharge untreated propylene glycol wastewater into the river. He argues, however, that when dumping the propylene glycol wastewater down the toilet, he was not acting negligently. We disagree.

In viewing the evidence in the light most favorable to the government, we have little trouble concluding that a reasonable jury could have found that Ortiz violated § 1319(c)(1)(A). Prior to May 29th, investigators told Ortiz that they had traced a black discharge with a strong onion odor from the Colorado River, up the storm drain, to the Chemical Specialties facility, and questioned him about how he was disposing of wastewater. The government presented evidence that prior to these conversations, Ortiz was dumping propylene glycol wastewater (a black substance with a strong onion odor) down the toilet. A reasonable jury could have well found that Ortiz acted negligently on May 29th when, after being alerted by investigators, he again dumped propylene glycol wastewater into the toilet.[1] Because a reasonable jury could have found beyond a reasonable doubt that Ortiz committed a violation of § 1319(c)(1)(A) on May 29, 2002, we reverse the district court's judgment of acquittal on Count One of the superceding indictment.

**B**

Although the jury specifically found that Ortiz discharged a pollutant without a permit, the district court nevertheless declined to apply a sentence enhancement for "discharge without a permit." U.S.S.G. § 2Q1.3(b)(4) ("If the

---

[1] We do not imply that an individual commits a negligent discharge violation only upon prior notification from officials of a possible link between a point source and a navigable water. Here, however, the facts are more than sufficient to obtain a conviction under § 1319(c)(1)(A).

offense involved a discharge without a permit or in violation of a permit, increase by 4 levels."). Central to the trial court's ruling was the determination that a § 2Q1.3(b)(4) enhancement can apply only where a permit is available for the activity but the defendant failed to obtain one. We review the district court's legal determination de novo. United States v. Doe, 398 F.3d 1254, 1257 (10th Cir. 2005). Because we conclude that the factual impossibility of obtaining a permit is not a defense to a § 2Q1.3(b)(4) enhancement, we reverse the district court's sentencing decision.

One court has previously had occasion to address this issue and has held that a § 2Q1.3(b)(4) enhancement may apply notwithstanding the unavailability of a permit for the offense conduct. See United States v. Perez, 366 F.3d 1178, 1186 n.10 (11th Cir. 2004). Commentary to the enhancement supports the Eleventh Circuit's view: "Subsection (b)(4) applies . . . where there was a failure to obtain a permit when one was required." U.S.S.G. § 2Q1.3(b)(4), Application Note 7 (emphasis added); Stinson v. United States, 508 U.S. 36, 38 (1993) (an application note "is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with [the guideline]."). With few non-relevant exceptions, a permit is always required before discharging a pollutant into navigable waters. See, e.g., E.P.A. v. California ex rel. State Water Resources Control Bd., 426 U.S. 200, 205 (1976) ("it is unlawful for any person to discharge

a pollutant without obtaining a permit and complying with its terms"); <u>Natural Resources Defense Council, Inc. v. Costle</u>, 568 F.2d 1369, 1375-76 (D.C.Cir.1977) ("There are innumerable references in the legislative history to the effect that the Act is founded on the 'basic premise that a discharge of pollutants without a permit is unlawful and that discharges not in compliance with the limitations and conditions for a permit are unlawful.' Even when infeasibility arguments were squarely raised, the legislature declined to abandon the permit requirement.") (quoting 118 Cong. Rec. 10215 (1972)); <u>Driscoll v. Adams</u>, 181 F.3d 1285, 1289 (11th Cir. 1999) ("the amended CWA absolutely prohibits the discharge of any pollutant by any person, unless the discharge is made according to the terms of [an NPDES] permit"); <u>Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.</u>, 73 F.3d 546, 559 (5th Cir. 1996) ("the discharge of any pollutant without a NPDES permit is an unlawful act").

The CWA's plain language clearly provides that a permit is always required to discharge any pollutant: "Except as in compliance with this section and sections [including the permit requirement], the discharge of <u>any pollutant</u> by any person shall be unlawful." 33 U.S.C. § 1311(a) (emphasis added). Moreover, adopting the district court's view would create perverse incentives that the Sentencing Commission cannot have intended. If a § 2Q1.3(b)(4) enhancement applies only when a defendant could have received a permit for the offense

conduct, "businesses would have an incentive not to obtain permits prior to discharging pollutants; and businesses that discharge pollutants would have an incentive to make those discharges so egregious in magnitude, duration, and toxicity that no permitting authority would ever allow them." United States v. M/G Transp. Servs., Inc., 173 F.3d 584, 588 (6th Cir. 1999).[2] Because the ability to obtain an NPDES permit is not a prerequisite to the application of § 2Q1.3(b)(4), the district court erred as a matter of law in declining to apply the enhancement for discharging without a permit.

## C

At sentencing, the district court declined to apply an enhancement for "ongoing, continuous, or repetitive discharge" under U.S.S.G. § 2Q1.3(b)(1)(A), finding that the government failed to prove that Ortiz discharged pollutants on a repetitive basis. Because we reverse the judgment of acquittal on Count One,

---

[2] We emphasize that it was only factually impossible, not legally impossible, for Ortiz to have obtained an NPDES permit for the offense conduct. Compare United States v. Dalton, 960 F.2d 121 (10th Cir. 1992) (reversing a conviction for possession of an unregistered machine gun for legal impossibility, because a separate statute prohibited the registration of machine guns) with United States v. Eaton, 260 F.3d 1232, 1236 (10th Cir. 2001) (upholding a conviction for possession of unregistered pipe bombs, because "[t]here is no similar statute criminalizing the possession of a destructive device such as a pipe bomb. . . . Whether the ATF would have accepted the pipe bomb for registration does not bear on the issue of legal impossibility."). See also M/G Transp. Servs., 173 F.3d at 588 ("the issuance of permits for the discharge of pollutants is an integral part of the regulatory scheme of the Clean Water Act. . . . Such a scenario is qualitatively different from that presented in Dalton.").

Ortiz stands convicted of discharging pollutants in contravention of the CWA on two dates: May 29, 2002 and June 18, 2002. These two convictions suffice for application of the § 2Q1.3(b)(1)(A) enhancement. See, e.g., United States v. Strandquist, 993 F.2d 395, 400-401 (4th Cir. 1993) (conviction on two counts of illegal discharge on two separate days amounts to "repetitive discharge"); United States v. Catucci, 55 F.3d 15, 18 (1st Cir. 1995) ("the two PCB-laden transformers were dumped on separate occasions. Nothing more need be shown to activate the repetitive discharge adjustment.").

Based upon commentary to the enhancement provision, Ortiz argues that § 2Q1.3(b)(1)(A) applies only in cases of two or more knowing discharge violations, and asserts that the enhancement may not be applied to sentences for negligently discharging pollutants. Application Note 3 provides: "The specific offense characteristics in this section assume knowing conduct. In cases involving negligent conduct, a downward departure may be warranted." Plainly, the commentary contemplates application of a § 2Q1.3(b)(1)(A) enhancement to sentences for negligent discharge violations, but authorizes a downward departure in such circumstances.

Conviction for knowing discharge under 33 U.S.C. § 1319(c)(2)(A) and a separate conviction for negligent discharge under 33 U.S.C. § 1319(c)(1)(A) justify application of the § 2Q1.3(b)(1)(A) enhancement. The finding that Ortiz's

- 17 -

offense did not result in an ongoing, continuous, or repetitive discharge of a pollutant is clearly erroneous.

### III

We **REVERSE** the judgment of acquittal entered on Count One of the superseding indictment and reinstate the jury's verdict convicting Ortiz of negligently discharging a pollutant in violation of 33 U.S.C. §§ 1311(a) and 1319(c)(1)(A). We **REMAND** this matter to the district court with instructions to **VACATE** Ortiz's sentence and resentence him in accordance with this opinion.