**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Flavio David MENDOZA, Defendant–Appellant.**

**No. 00–10219.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 10, 2001

Filed March 29, 2001

Shawn Halbert, Assistant Federal Public Defender, San Francisco, California, for the defendant-appellant.

Laurie Kloster Gray, Assistant United States Attorney, San Francisco, California, for the plaintiff-appellee.

Before: GOODWIN, GRABER, and PAEZ, Circuit Judges.

GOODWIN, Circuit Judge:

Flavio David Mendoza ("Mendoza") appeals his conviction under 18 U.S.C. § 32(a)(6). He contends that the district court erred: (1) by denying his motion for acquittal; (2) by allowing the jury to hear undisclosed expert testimony in violation of Federal Rule of Criminal Procedure 16; and (3) by failing to instruct the jury that the government must prove that he knew an aircraft was or could be in flight and would be endangered or that he intended to endanger an aircraft in flight. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 29, 1999, Mendoza took his girlfriend, Young Ae Jeong ("Jeong"), to the St. Louis Airport where she was to take a Trans World Airlines ("TWA") flight to San Francisco and then connect to a Korean Airlines ("KAL") flight to Seoul, Korea. Jeong missed her original flight and took the next flight to San Francisco. Mendoza and Jeong were informed that Jeong would have only a "couple of minutes" to make her connection.

Once Jeong was en route to San Francisco, Mendoza placed three telephone calls to KAL. Each call inquired whether KAL could ensure that Jeong could make her flight and each time he was told that nothing could be done. During one of the calls, he was told that the KAL flight was to be delayed 30 minutes from its original departure time of 12:20 a.m. Later that evening, he left his house and walked to a

nearby pay phone to make an anonymous call to the San Francisco Airport. It is undisputed that the purpose of his call was to delay the departure of KAL Flight 24.

At approximately 1:00 a.m.[1] on December 30, 1999, Mendoza's anonymous telephone call to San Francisco Airport was received by a communications dispatcher. By this time, Flight 24 had already left the gate and was minutes from takeoff.[2] In the call, Mendoza raised the possibility that explosives may be present on a KAL flight that evening.

The following transcript was made of Mendoza's call:

Mendoza: Hi ... uh, my, my name is George (unintelligible). I have a comment ... on ... on ... when I was on the airplane, I heard some conversation (beep, beep) about a [gentleman] talking about some explosive (unintelligible) the Korean Airline flight this ... this evening. So (unintelligible) it is my civic duty to (beep, beep) (unintelligible) it might be a joke, but that's what I heard ...

Dispatcher: Oh, of course. Hum, how long ago did you hear this?

Mendoza: Around one hour and a half ... something like that.

Dispatcher: An hour and a half ago?

Mendoza: Yes ma'am. (Beep, beep)

Dispatcher: What did he say?

Mendoza: Uh, something ... some kind of load ... called something like ... explosives. (Unintelligible) honestly, I don't like to get involved with this.

Dispatcher: They were talking about an explosion?

Mendoza: Yeah, that's correct.

Dispatcher: That was going to happen here at the airport?

---

1. The Event Chronology Transcript of December 30, 1999, showed that the call was received at 1:01 a.m. The dispatcher testified that the notation of the time was actually one or two minutes after she received the call.

Events are recorded on the Event Chronology Transcript by typing the event into the

computer and hitting enter. Therefore, events are not necessarily recorded at the time they happen, but at the time that a person records the information.

2. The flight had left the gate at 12:50 a.m. and was airborne at 1:04 a.m.

Mendoza: Uh, they mention uh Korean Airline flight tonight (unintelligible) ...

Dispatcher: I'm sorry ...

Mendoza: (unintelligible) getting involved at this (unintelligible)

Dispatcher: No, of course, but I, I just want to make sure I get the right ...

At trial, Mendoza claimed that because he wanted only to cause confusion in order to delay the flight he deliberately did not use the word "bomb," instead referring to "explosive materials." He also testified that he said it might be a "joke" so as not to cause further alarm. Nonetheless, Mendoza did admit that he wanted airport personnel to take the call seriously enough to do something about it, such as checking the airplane.

Categorizing the call as a Code 10 (bomb threat), the communications dispatcher immediately notified KAL representatives and Sergeant Steven Harris ("Sergeant Harris") with the San Francisco Police Department Airport Bureau. After listening to the taped call, Sergeant Harris asked representatives from KAL if they suspected anyone who might have made the threat. One of the employees said that someone had been calling the airline earlier requesting that KAL delay the flight for a passenger arriving on a TWA flight, and she thought that the calls may be connected. When the employee listened to the taped call, she did think, although she was not sure, that it was the same person who had called earlier in the evening. Sergeant Harris asked to speak to the passenger who was the subject of the calls, and representatives of KAL said that she was at the ticket counter. Jeong was brought to Sergeant Harris's office to listen to the taped call. After listening to the tape, Jeong identified her boyfriend (Mendoza) as the caller and gave the officers his phone number and address.

Following his conversation with Jeong, Sergeant Harris telephoned Mendoza. Mendoza admitted to calling KAL but denied calling the airport even after Sergeant Harris informed him that both KAL personnel and Jeong had identified his voice. However, after Sergeant Harris informed Mendoza that, as a result of the call, there was concern for the safety of Flight 24 and the plane was returning to the airport to be evacuated and searched, Mendoza admitted that the call was a hoax and that he wanted everyone to know that there was no explosive device. Following this conversation, Sergeant Harris told KAL that he did not believe there was a bomb on Flight 24.

According to the first officer of Flight 24, at approximately 2:08 a.m., the pilots were notified that there was a bomb on the flight. That notification spurred the following actions: the flight was turned around; the chief of the cabin crew was alerted; the extra crew on the plane was summoned to the cockpit; and discussions were had about the possibility of dumping fuel to reduce the aircraft's landing weight. The pilots also discussed whether the explosives were likely to be on a timer or on an altimeter trigger and, as a result, whether they should maintain or lower their cruising altitude.

At 2:52 a.m. the crew of Flight 24 was informed that there was in fact no bomb on board and that the police had caught the caller who was merely attempting to delay the flight. After determining that the aircraft had enough fuel to continue its flight to Seoul, the aircraft resumed its original course.

The government filed a three-count indictment. Count one charged Mendoza with using an instrument of interstate commerce, a telephone, to willfully and maliciously convey false information, knowing the same to be false, concerning an alleged attempt to be made to kill and injure persons and destroy a vehicle and personal property, in violation of 18 U.S.C. § 844(e). Count two charged him with willfully, maliciously, and with reckless disregard for human life conveying false information, knowing the information to be false concerning an attempt or alleged attempt to destroy an aircraft in violation of 18 U.S.C. § 35(b). Count three charged

Mendoza with willfully communicating information, knowing the information to be false and under circumstances in which such information may reasonably be believed, thereby endangering the safety of an aircraft in flight in violation of 18 U.S.C. § 32(a)(6). Prior to trial, the district court granted the government's motion to dismiss count two, and the indictment was amended with renumbered counts.

After the close of the government's case, Mendoza moved for an acquittal on both counts pursuant to Federal Rule of Criminal Procedure 29(a), which he renewed after the close of his case. Both motions were denied. The jury returned a guilty verdict on the § 32(a)(6) charge (count two), but was unable to reach a verdict on the § 844(e) charge (count one). Count one was dismissed upon the government's motion. On April 5, 2000, Mendoza filed a motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c).

The district court denied that motion and sentenced Mendoza to ten months' incarceration. Mendoza timely appeals.

## DISCUSSION

### I. Insufficiency of the Evidence

Mendoza argues that the government did not produce sufficient evidence to prove beyond a reasonable doubt to a rational trier of fact that Mendoza was the cause of any endangerment to Flight 24 while it was in flight. He argues: (1) there was insufficient evidence presented at trial to prove that Flight 24 was endangered while in flight; (2) Mendoza was prejudiced by the government's reference, during closing argument, to the dictionary definition of endangerment and its related comments thereto; and (3) if Flight 24 was endangered, he was not responsible for such endangerment because intervening actors broke the chain of causation.

■ This court reviews de novo the district court's ruling on Mendoza's motion for acquittal. *See United States v. Tubiolo*, 134 F.3d 989, 991 (9th Cir.1998).

The test applied is the same as the test for challenging the sufficiency of the evidence. *United States v. Clayton*, 108 F.3d 1114, 1116 (9th Cir.1997). "Consequently, we review the evidence in a light most favorable to the prosecution to determine whether any rational trier of fact could find the essential elements of the offense beyond a reasonable doubt." *Id.*

### A. Endangerment to the Safety of Flight 24 While in Flight

■ Mendoza argues that there was insufficient evidence to prove that his actions endangered Flight 24 while in flight. The statute does not define "endangering," and we have been cited no case law discussing the term as it is used in 18 U.S.C. § 32(a)(6).

■ Statutory interpretation begins with the plain language of the statute. *United States v. Hanousek*, 176 F.3d 1116, 1120 (9th Cir.1999). If the text of the statute is clear, this court looks no further in determining the statute's meaning. *See Id.* Because the statute does not define "endangering," "we 'start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used.'" *Id.* (quoting *Russello v. United States*, 464 U.S. 16, 21, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983)) (quoting *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962)).

The ordinary meaning of the term "endanger" as used in this context is "to bring into danger or peril of probable harm or loss: imperil or threaten to danger ...: to create a dangerous situation." Webster's Third New International Dictionary (unabridged) 748 (1961); *see also* Black's Law Dictionary 547 (7th ed.1999) (defining "endangerment" as the "act or an instance of putting someone or something in danger; exposure to peril or harm"). Cases interpreting the term provide a similar definition. *See Price v. United States Navy*, 39 F.3d 1011, 1019 (9th Cir.1994) (holding, in the context of the Resource Conservation and Recovery Act, that endangerment

"means a threatened or potential harm and does not require proof of actual harm"); *Marchese v. United States,* 126 F.2d 671, 674 (5th Cir.1942) (defining, in the context of the Espionage Act, the phrase "endanger the safety" to "cover cases where no specific injury was done or intended, but only a dangerous condition created"). We find nothing in the legislative history that dictates a different result and, therefore, presume that Congress intended its words to have their ordinary meaning.

Mendoza argues that, because the statute carries a possible sentence of twenty years, the term "endangerment" must include a sufficient quantum of increased danger above and beyond the danger inherent in routine flying to justify conviction under the statute. The government produced such evidence.

At trial, Dongsup Park ("Park"), first officer and co-pilot on Flight 24, detailed Flight 24's activities on December 30, 1999, and the events that occurred once Flight 24 was alerted that there was a bomb on board. He testified: (1) the plane changed course to return to the airport; (2) the cabin crew was notified; (3) the extra crew was called to the flight deck; and (4) discussions were had on whether to "dump" fuel to reduce weight for an emergency landing and whether to maintain or lower the aircraft's altitude depending on their guess as to the type of detonation device the alleged bomb carried. He also testified that the reserve captain's hands were shaking and that, upon completion of the flight (the plane ultimately continued to Korea), he was personally exhausted from the stress of the situation and from having been so nervous.

In addition, Park testified, over defendant's objection, that he was "sure" that the bomb threat endangered the safety of the aircraft.[3] He explained that the safety of the aircraft was endangered because of the added stress on the pilots, as well as the additional flying time and work caused by the false report.

The danger to Flight 24 created by Mendoza's call was above and beyond the danger inherent in routine flying. The stress to the pilots, coupled with the increased flying time caused by the bomb scare, made for a situation seldom experienced on an aircraft and created a level of danger not normally present. The government produced sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that Flight 24 was endangered while in flight.

## B. The Government's Use of the Dictionary

Turning to the government's use of a dictionary during closing argument to define the term "endanger," and its comments related to that definition, there was no reversible error. While focused on the last element of the § 32(a)(6) charge—"thereby endangering the safety of any such aircraft in flight"—the government stated:

> [T]he court does not have for you a legal definition. Perhaps there is no legal definition of what "endangering" is. I looked in the dictionary. "Endanger" is to expose to danger, to imperil—in other words, not that they actually made it more dangerous, but that they, in my—I would submit to you "danger" means increase the risk to the safety, endangering the safety. They increased the risk of danger.

Mendoza did not object to the government's statements made during closing argument. Instead, he argued in closing that the government's definition, which he alleged suggested that any increase in the possibility of danger could constitute endangerment, was incorrect.

> In rebuttal the government stated:
> But [Mendoza's counsel] interchanged the terms "in danger," I–N, second word

that was overruled. This issue is discussed in greater detail in Part II.

danger, and "endanger," E–N–D, word one, which is the operative word, "endanger." That plane—it doesn't say that plane has to be in danger. It says, "that plane has to have had"—"has to have endangered the safety of that plane, endangered the safety."

.    .    .    .    .

... Those kinds of stresses and activities that the pilots had to go through, did that increase the risk of danger? That's your decision.

Mendoza concedes that the dictionary definition of "endanger" that was read by the government was not in itself objectionable. Nevertheless, he argues that it is reversible error for a jury to consult a dictionary during deliberation to define a legal term because the jury's exposure to extrinsic information gives rise to a rebuttable presumption of prejudice. He contends that such a presumption should apply here. *See Mayhue v. St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919, 922 (10th Cir.1992) (stating that a rebuttable presumption of prejudice arises whenever a jury is exposed to external information in contravention of the district court's instructions); *United States v. Kupau*, 781 F.2d 740, 744–45 (9th Cir.1986) (holding that the district judge erred in giving dictionary to the jury, but that the government met its obligation of proving that the presence of the dictionary was harmless beyond a reasonable doubt). The case at hand is distinguishable. Here the extrinsic evidence was read to the jury under the control of a judge, in the presence of the defendant, and Mendoza had the opportunity to object and thereby provide the court with the opportunity to instruct the jury and cure any prejudice.

■ Because Mendoza failed to object to the government's use of the dictionary at trial, we review for plain error. *See United States v. Barajas–Montiel*, 185 F.3d 947, 953 (9th Cir.1999). Under the plain error test, we consider whether there is (1) an error, (2) that is plain, and (3) which affects substantial rights. *United States v. Keys*, 133 F.3d 1282, 1286 (9th

Cir.1998). To establish that the error affected the defendant's substantial rights, the defendant generally must show that the error was prejudicial; " '[i]t must have affected the outcome of the District Court proceedings.' " *United States v. Lussier*, 128 F.3d 1312, 1317 (9th Cir.1997) (quoting *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). If all three conditions are satisfied, we may then exercise our "discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (citations and internal quotation marks omitted).

In this case, there was no plain error. Assuming that the government's use of the dictionary was improper (instead of asking the trial judge to define the term), as Mendoza conceded, the definition read from the dictionary was not in itself objectionable. Therefore, we need not address the matter further.

■ We also conclude that the government's related comments during closing argument do not require reversal. Once again, because Mendoza failed to object to the government's statements at trial, the statements must be reviewed under the plain error standard. *See Barajas–Montiel*, 185 F.3d at 953. Here, even should we find an error, we must attempt to determine the effect of the error on the juror's deliberations and determine whether it was prejudicial.

Contrary to Mendoza's argument, the government did not materially misstate the law. At the most, the government's comments were confusing and encroached slightly on the judge's duty.

■ Nevertheless, even when a contemporaneous objection is made, "[i]mproprieties in counsel's arguments to the jury do not constitute reversible error unless they are so gross as probably to prejudice the defendant, and the prejudice has not

been neutralized by the trial judge." *United States v. Guess,* 745 F.2d 1286, 1288 (9th Cir.1984) (citations and internal quotation marks omitted). Here, the government's arguments contained nothing that prejudiced the defendant.

■■■ The jury was also instructed, following closing arguments, that the arguments of counsel are not evidence. A slight misstatement of law by a prosecutor can be rendered harmless by the court's proper instruction to the jury. *See Lingar v. Bowersox,* 176 F.3d 453, 460 (8th Cir. 1999) ("When counsel misstates the law, the misstatement is harmless error if the court properly instructs the jury on that point of law or instructs that the attorneys' statements and arguments are not evidence."); *Guess,* 745 F.2d at 1288 (holding that prejudice can be neutralized by the trial judge); *United States v. Granville,* 716 F.2d 819, 822 (11th Cir.1983).

## C. Causation

■■■ Mendoza contends that the government identified only two causes of endangerment to the flight: pilot stress and increased flying time. He argues that both of those effects were completely or substantially caused by the intervening and unforeseeable actions of other parties. This contention is unpersuasive. The actions of KAL and the airport authorities were entirely foreseeable given Mendoza's conduct.

■■■ Causation in criminal law has two requirements: cause in fact and proximate cause.[4] *See United States v. Spinney,* 795 F.2d 1410, 1415 (9th Cir.1986). Mendoza concedes that his call was the cause in fact. But for his call, Flight 24 would not have been endangered.

We also conclude that a jury could find that Mendoza was the proximate cause of the endangerment to Flight 24. " '[E]ven when cause in fact is established, it must be determined that any variation between the result intended ... and the result actually achieved is not so extraordinary that it would be unfair to hold the defendant responsible for the actual result.' " *Id.* (quoting W. LaFave & A. Scott, Criminal Law § 35, at 246 (1972)). The question at issue is whether the actual result achieved by Mendoza's call, the endangerment of the safety of Flight 24 while in flight, was so extraordinary that it would be unfair to permit a jury to hold Mendoza responsible. We think not.

Mendoza intended those responsible for the safety of the aircraft to believe there may be explosives on Flight 24. In his attempt to delay the aircraft, Mendoza informed the dispatcher that he overheard there were explosives on a KAL flight. When the dispatcher questioned Mendoza whether he meant that an explosion was to occur at the airport, he corrected the dispatcher that it was to occur on a KAL flight. Mendoza reasonably foresaw that his call could be interpreted to mean there was a bomb on the flight. He tried to control the effect of his call by using a qualifier-that the conversation he overheard regarding the explosives on the aircraft may be a joke. Thus, it was not unexpected or extraordinary that those responsible for the safety of the flight would "misinterpret" his call and believe that there was a bomb on the aircraft. Indeed, Mendoza intended for KAL to believe such a possibility was real enough to delay the flight.

Nor was it unexpected that the flight was allowed to depart. Viewing the evidence in the light most favorable to the government, the call was received four to five minutes prior to take off. The communications dispatcher then contacted law enforcement and KAL personnel. This activity took time. Moreover, the flight was not identified by number. It was entirely foreseeable that, if such a call were made just minutes before an aircraft was scheduled for take off, there may be insufficient

---

4. We assume, without deciding, that 18 U.S.C. § 32(a)(6) contains a causation ele-ment.

time to take remedial action. The chain of events was predictable.

Finally, we do not find it extraordinary that a delay ensued between the time when the airport authorities contacted Mendoza and Mendoza admitted that his call was a hoax meant to delay the flight and the time when KAL informed the crew of Flight 24 that the call was a hoax. The pilots were informed at 2:08 a.m. that there was a bomb on the flight and informed at 2:52 a.m. that the original call was a hoax. The event chronology shows an entry at 2:27 a.m. stating "suspect is in St. Louis and admitted this." Viewing the evidence in the light most favorable to the government, it would appear that the authorities had information that the call was a hoax at least 25 minutes before the pilots were contacted. Once Sergeant Harris contacted Mendoza and Mendoza confessed, Sergeant Harris contacted representatives of KAL and informed them that it was his "gut feeling that this was the person that had made the call" and that he believed the call was made to delay the flight. It was KAL's decision how to proceed with their aircraft from that point. Obviously these conversations took time, as did KAL's deliberations. While the pilots may not have been contacted as early as possible, the delay was "not so extraordinary that it would be unfair to hold the defendant responsible for the actual result." *Id.*

Because a rational trier of fact could have found beyond a reasonable doubt that Mendoza's call caused Flight 24 to be endangered while in flight, the district court did not err in denying Mendoza's Rule 29(c) motion.

## II.  Expert Testimony

■■■ Mendoza next contends that the district court abused its discretion by admitting the opinion of first officer Park that Flight 24 was endangered. He argues that Park was an undisclosed expert witness and that Park's testimony surprised him and denied him a fair trial. The Federal Rules of Criminal Procedure provide that, upon the defendant's request,

the government must disclose a written summary of expert testimony that the government intends to offer at trial. Fed. R.Crim.P. 16(a)(1)(E). If the government fails to comply with this rule, the district court may order disclosure, grant a continuance, prohibit the government from offering the evidence at trial, or grant whatever relief the district court deems just under the circumstances. Fed.R.Crim.P. 16(d)(2). A district court's evidentiary rulings during trial are reviewed for an abuse of discretion. *See United States v. Hankey,* 203 F.3d 1160, 1166 (9th Cir.2000).

Mendoza's counsel was not informed that Park would testify until the morning of trial. Defense counsel had previously been informed by the government that the captain of the flight, not Park, would testify. When counsel learned from the government's opening statement that Park would testify about his beliefs regarding the danger of the increased risks to the aircraft, counsel immediately moved to exclude Park's proposed testimony. Counsel argued that Park's testimony would be that of an undisclosed expert and that, had she been on notice, she may have acquired a rebuttal witness to meet the opinion of Park. The court disagreed, characterizing the proposed testimony as the opinion of a percipient lay witness. Over a subsequent objection by Mendoza's counsel during the direct examination of Park, the court allowed Park to testify that Flight 24 was endangered.

■■■ Even if we should assume that the district court erred by admitting Park's opinion that Flight 24 was endangered because it was an "expert" rather than a "lay" opinion, on this record any error was harmless. Although the district court did not require Park to be formally qualified as an expert witness, we can discern from the record that the witness could have been qualified as an expert under Federal Rule of Evidence 702. *See United States v. Figueroa–Lopez,* 125 F.3d 1241, 1247 (9th Cir.1997) (holding that expert testimony erroneously allowed under Federal

Rule of Evidence 701 was harmless error despite failure to go through usual process for qualifying expert testimony because it was clear from the record the witness was qualified to give the testimony); *United States v. Ramsey,* 165 F.3d 980, 984 (D.C.Cir.1999) ("Although the trial judge never formally qualified [the witness] as an expert witness, his testimony functionally satisfied the requirements for expert testimony set forth in Federal Rule of Evidence 702.").

Park had worked for KAL for seven years, three of which were training. He had been an officer on both the Boeing 777, which was involved in this case, and the Airbus. He testified that he had emergency training, through simulator and video, that covered situations such as engine failures, system malfunctions, and bomb scenarios. Additionally, although Mendoza's counsel objected to the expert testimony on the basis of lack of proper prior disclosure, she did not object to the qualifications of the witness, nor did she argue on appeal that the witness was not qualified to give the opinion at issue. Therefore, even if the testimony at issue was expert opinion, we hold that Park was qualified to deliver an opinion concerning aircraft endangerment and that "the failure formally to go through the usual process-although an error-was clearly harmless." *Figueroa–Lopez,* 125 F.3d at 1247; *see also Hankey,* 203 F.3d at 1168–69 (expert testimony on gangs found to be both relevant and reliable based on expert's (1) 21 years of experience as a police officer; (2) years of undercover gang work; (3) formal training in gang structure and organization; and (4) experience teaching classes on gangs).

■ We also conclude that the government's failure to comply with Rule 16 does not warrant reversal. We have stated that a violation of Rule 16 does not itself require reversal, or even exclusion of the affected testimony. [The appellant] must demonstrate prejudice to substantial rights to justify reversal for violations of discovery rules. The prejudice that must be shown to justify reversal for a discovery violation is a likelihood that the verdict would have been different had the government complied with the discovery rules, not had the evidence [been] suppressed.

*Figueroa–Lopez,* 125 F.3d at 1247 (citations and internal quotation marks omitted). It was revealed at oral argument that the government had given notice that the captain of the flight would testify to emergency procedures, what occurred on Flight 24, and endangerment. For the purposes of a fair trial it was immaterial that the captain was not available, and that an equally qualified witness who had experienced the same factual circumstances, was substituted.

In a more complex case, a more serious default by the government would have been its failure to disclose the bases and reasons for the opinions of either the pilot or Park. *See* Fed.R.Crim.P. 16(a)(1)(E). However, it seems obvious that pilot stress and the increased time of the plane in the air would be bases for either pilot to believe that the flight was endangered, testimony that Mendoza's counsel knew prior to trial that the pilot intended to give. Mendoza has failed to demonstrate how the verdict would have been different had the government fully complied with Rule 16. Therefore, reversal based on the government's Rule 16 violation is not required. Mendoza's substantial rights were not violated.

■ Finally, Mendoza contends that he was prejudiced by the court's failure to instruct the jury according to Ninth Circuit Model Jury Instruction 4.17, which he requested. The model instruction would have told the jury that opinion testimony should be judged like any other testimony and could be accepted or rejected just like any other testimony, notwithstanding that it was given by a person who, "because of education or experience, [is] permitted to state opinions and the reasons for [his] opinions." Ninth Circuit Manual of Model Criminal Jury Instruction 4.17. Instead,

the court gave the general credibility instruction, informing the jury that they could "believe everything a witness says, or part of it, or none of it." Ninth Circuit Manual of Model Criminal Jury Instruction 3.9. Mendoza claims that the court's failure to give the instruction compromised Mendoza's ability to argue to the jury that it was not required to accept Park's testimony merely because he was a trained pilot.

■ Mendoza did not object to the instruction given. Failure to timely object to jury instructions limits review to plain error. *Barajas–Montiel,* 185 F.3d at 953. Although the court erred by failing to give the instruction, the error did not rise to the level that it prejudiced Mendoza. He could still effectively argue to the jury that they did not have to believe Park's testimony, an argument that he never made. The district court did not commit plain error.

### III.  Intent to Endanger an Aircraft in Flight Under § 32(a)(6)

■ Mendoza also challenges the sufficiency of the jury instructions given on the 18 U.S.C. § 32(a)(6) charge. He argues that the government should be required to prove willfulness with respect to the endangerment element.

At trial, Mendoza submitted a proposed jury instruction regarding the elements of 18 U.S.C. § 32(a)(6), which included the requirement that Mendoza "either knew that [Flight 24] was or could be in flight and would be endangered, or that he intended to endanger [Flight 24] in flight."[5]

The district court denied his proposed instruction. However, the instruction given was similar to Mendoza's proposed instruction although it did not include the element that Mendoza "either knew that such aircraft was or could be in flight and would be endangered, or that he intended to endanger such aircraft in flight." Mendoza failed to object to the instruction given. Review, therefore, is for plain error. *Barajas–Montiel,* 185 F.3d at 953.

■ We start from the basic premise that the " 'definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute.' " *Staples v. United States,* 511 U.S. 600, 604, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) (quoting *Liparota v. United States,* 471 U.S. 419, 424, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985)). In determining the elements the government must prove to establish a violation of § 32(a)(6), "the focus of our inquiry is the intent of Congress." *United States v. Nguyen,* 73 F.3d 887, 890 (9th Cir.1995). We look first to the text of the statute in determining the intent of Congress. *Id.*

Section 32(a)(6) states: "Whoever willfully-communicates information, knowing the information to be false and under circumstances in which such information may reasonably be believed, thereby endangering the safety of any such aircraft in flight" is guilty of the offense. The text of the statute does not support Mendoza's argument that he had to have known that the aircraft would be in flight and would

---

**5.** Mendoza's proposed instruction read in its entirety:

> David Mendoza is charged with willfully communicating information, knowing the information to be false and under circumstances in which such information may reasonably be believed, thereby endangering an aircraft in flight, in violation of Section 32(a)(6) of Title 18 of the United States Code. To prove this charge, the government must prove each of the following elements beyond a reasonable doubt:

(1) That on or about December 30, 1999 David Mendoza communicated information;

(2) That he did so willfully;

(3) That he knew the information to be false and that circumstances were such that the information would reasonably be believed;

(4) That he either knew that such aircraft was or could be in flight and would be endangered, or that he intended to endanger such aircraft in flight; and

(5) That he did in fact endanger an aircraft in flight.

be endangered, or that he must have intended to endanger the aircraft in flight. A plain reading of the statute teaches that it is enough that Mendoza willfully communicated information knowing it was false and under circumstances in which the information could reasonably be believed, and as a result of his intentional misconduct, an aircraft was endangered while in flight.

Mendoza argues that, without reading into the statute an additional mens rea requirement, the phrase "endangering the safety of any such aircraft in flight" improperly imposes strict liability. He argues that this court should insert a mens rea requirement into each element of the statute pursuant to the Supreme Court decision in *Staples* and its progeny.

In *Staples*, 511 U.S. at 623, 114 S.Ct. 1793, the Court held that the government must prove beyond a reasonable doubt the defendant knew the weapon he possessed had characteristics that brought it within the statutory definition of a machine gun in order to be convicted for failing to register a machine gun. The Court noted that the mere fact that a statute is silent concerning the mens rea required for a violation "by itself does not necessarily suggest that Congress intended to dispense with a conventional mens rea element, which would require that the defendant know the facts that make his conduct illegal." *Id.* at 605, 114 S.Ct. 1793. The Court stated that it must construe the statute at issue "in light of the background rules of the common law, in which the requirement of some mens rea for a crime is firmly embedded." *Id.* (citations omitted).

We agree that "the background rule of the common law favoring mens rea should govern interpretation" of 18 U.S.C. § 32(a)(6). *Staples*, 511 U.S. at 619, 114 S.Ct. 1793. Unlike the statute at issue in *Staples*, which did not contain a mens rea element and thus made criminal a broad range of otherwise innocent conduct,

§ 32(a)(6) expressly sets forth two mens rea elements: (1) the defendant willfully conveyed false information (2) knowing the information to be false and under circumstances in which the information may reasonably be believed. Therefore, although § 32(a)(6) fails to specify whether the intent to convey false information knowing it to be false includes the intent to endanger the aircraft while in flight, the statute nevertheless punishes what is otherwise culpable conduct.

In support of his argument that we should read in an additional mens rea element, omitted by Congress, Mendoza relies on this court's decision in *United States v. Pasillas–Gaytan*, 192 F.3d 864 (9th Cir.1999). In *Pasillas–Gaytan*, the jury was instructed that, where the defendant was charged with violating 18 U.S.C. § 1425, it could convict the defendant if the government proved that he "knowingly acquired naturalization" and that such naturalization was contrary to law. *Id.* at 867.[6] This court rejected the district court's instruction stating that, because applying for naturalization would almost always be a knowing act, such a jury charge "essentially made § 1425 a strict liability offense, one which imposes criminal liability without regard to the defendant's state of mind at the time he sought naturalization." *Id.* We did not agree with the government that the statute was intended to impose no mens rea requirement, other than the requirement of intentionally applying for naturalization, and therefore held that the statute required a culpable state of mind as well. *Id.* at 868. We thus followed the reasoning of *Staples* and construed the statute "with 'the usual presumption that a defendant must know the facts that make his conduct illegal.'" *Id.* (quoting *Staples*, 511 U.S. at 619, 114 S.Ct. 1793). Therefore, the government was required to prove that Pasillas–Gaytan "either knew he was not eligible for naturalization due to his prior conviction, or

---

6. The relevant portion of 18 U.S.C. § 1425(a) provides that "[w]hoever knowingly procures or attempts to procure, contrary to law, the naturalization of any person, or documentary or other evidence of naturalization or of citizenship" shall be guilty of the offense.

knowingly misstated his criminal record on his application or in his interview." *Id.* (footnote omitted).

Here, as in *Pasillas–Gaytan,* the statute is silent on the mens rea requirement for one of its elements. However, in *Pasillas–Gaytan,* the court determined that the statute as drafted did not require that the defendant have a culpable state of mind and therefore read in the requirement that the defendant must know the underlying acts which made his conduct illegal. Section 32(a)(6) does not have the same shortcoming. Instead, it requires that the violator willfully communicate information, knowing the information is false and under circumstances in which such information could reasonably be believed. Therefore, the statute does not violate the "fundamental principle that a person is not criminally responsible unless 'an evil-meaning mind' accompanies 'an evil-doing hand.'" *Nguyen,* 73 F.3d at 890 (quoting *Morissette v. United States,* 342 U.S. 246, 251, 72 S.Ct. 240, 96 L.Ed. 288 (1952)).

We have stated:

> Criminal law presumes that the government must prove that the defendant possessed some mental state for each statutory circumstance that would make criminal otherwise innocent conduct even if this construction is not the most natural grammatical reading of the statutory language. Provided the defendant recognizes he is doing something culpable, however, he need not be aware of the particular circumstances that result in greater punishment. Criminal intent serves to separate those who understand the wrongful nature of their act from those who do not, but does not require knowledge of the precise consequences that may flow from that act once aware that the act is wrongful.

*United States v. Flores–Garcia,* 198 F.3d 1119, 1121–22 (9th Cir.2000) (citations and internal quotation marks omitted). These principles of criminal law instruct that the government does not need to prove that the Mendoza "willfully" endangered the safety of an aircraft while in flight. Here,

the government proved that Mendoza engaged in culpable conduct as required by the statute. There was no plain error in refusing the instruction requested.

AFFIRMED.