**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr><td>

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

SERGIO PATRICK RODRIGUEZ, AKA
Javier Rodrigues,
*Defendant-Appellant*.

</td><td>

No. 14-10122

D.C. No.
1:13-cr-00109-
LJO-SKO-1

OPINION

</td></tr>
</table>

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, District Judge, Presiding

Argued and Submitted
June 8, 2015—San Francisco, California

Filed June 24, 2015

Before: Barry G. Silverman, Ronald M. Gould,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Silverman

## SUMMARY[*]

### Criminal Law

The panel reversed a conviction for attempting to interfere with the safe operation of an aircraft, in violation of 18 U.S.C. § 32(a)(5) and (8), and remanded for resentencing on a conviction for aiming a laser pointer at an aircraft, in violation of 18 U.S.C. § 39A.

The panel held that there is insufficient evidence to support the conviction under § 32(a)(5) and (8), which required proof of both a willful attempt to interfere with an aircraft and a reckless disregard for human life, where the evidence showed that the defendant was attempting to see how far his laser would go at night and aimed it at a helicopter, but there is no evidence that he was trying to interfere with the pilot.

The panel remanded for resentencing on the § 39A conviction because the district court did not have the benefit of this court's decision in *United States v. Gardenhire*, 784 F.3d 1277 (9th Cir. 2015), and premised the sentence for the § 39A conviction, in part, on the fact that the defendant had also been convicted of violating § 32(a)(5), (a)(8).

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Carolyn D. Phillips (argued), Fresno, California, for Defendant-Appellant.

Benjamin B. Wagner, United States Attorney, Camil A. Skipper, Appellate Chief, Karen A. Escobar and Michael G. Tierney (argued), Assistant United States Attorneys, Fresno, California, for Plaintiff-Appellee.

**OPINION**

SILVERMAN, Circuit Judge:

There ought to be a law against shining a laser pointer at an aircraft. In fact, there is, and it's punishable by up to five years in prison, as appellant Sergio Rodriguez discovered for himself. Rodriguez, his girlfriend, and their kids were fooling around with a laser pointer one summer evening in the courtyard of their apartment complex – trying to see just how far it could go – and they shined it at overflying helicopters. Rodriguez was convicted of Aiming a Laser Pointer at an Aircraft, in violation of 18 U.S.C. § 39A, and was sentenced to the maximum sentence: five years in prison. Rodriguez does not challenge that conviction.

He also was convicted of another crime stemming from the same conduct – Attempting to Interfere with the Safe Operation of an Aircraft, in violation of 18 U.S.C. § 32(a)(5) and (8). That crime requires proof of a willful attempt to interfere with the operator of an aircraft, with either the intent to endanger others or reckless disregard for human life. Rodriguez was charged with and found guilty of the reckless

variety, and for that offense, was sentenced to fourteen years in prison.

The evidence clearly shows that Rodriguez was rightfully convicted of aiming the laser pointer at a helicopter (§ 39A). However, there is insufficient evidence that he willfully attempted to interfere with the safe flight of the helicopter (§ 32(a)(5)). Rather, the evidence showed that he was attempting to see how far his laser would go at night – a stupid thing to do, yes, but there is no evidence that he was trying to interfere with the pilot. Section 39A is designed for knuckleheads like him. On the other hand, 18 U.S.C. § 32(a)(5) is designed for both the Osama bin Ladens of the world – people trying to bring down a plane, intending to cause harm – and those who are aware that their actions are dangerous and could harm others, but just don't care. The failure to recognize this distinction is to fail to appreciate that Congress saw fit to create two different crimes, one more serious than the other, for two different types of offenders.

About a year after Rodriguez's conviction became final in district court, we decided *United States v. Gardenhire*, 784 F.3d 1277 (9th Cir. 2015). On very similar facts – a case in which another knucklehead aimed a laser pointer at a passing airplane just for the fun of it – we held, for the purposes of the applicable sentencing guidelines, that there was no evidence "that Gardenhire acted recklessly when he aimed his laser beam at the aircraft. The record is devoid of evidence, let alone clear and convincing evidence, that Gardenhire was aware of the risk created by his conduct." *Id.* at 1280.

We face a similar situation here. There's no problem with Rodriguez's conviction for Aiming a Laser Pointer at an

Aircraft, 18 U.S.C. § 39A.   But his conviction under 18 U.S.C. § 32(a)(5), (a)(8), for Attempting to Interfere with the Safe Operation of an Aircraft, required both proof of a willful attempt to interfere with an aircraft, and proof of a reckless disregard for human life.   That conviction is not supported by the evidence and must be reversed.  Because the district court did not have the benefit of *Gardenhire* and because it premised the sentence for the § 39A conviction, in part, on the fact that Rodriguez had also been convicted of violating § 32(a)(5), (a)(8), we also remand for resentencing on the § 39A conviction.

## I.  *BACKGROUND*

On August 25, 2012, at around 9:00 p.m., Air George – a medical transport helicopter for the Valley Children's Hospital in Fresno, California – had just set out to pick up a patient in Porterville.  The helicopter was about 1,100 feet up, flying at a speed of around 130 miles per hour.  Five minutes into the flight, the pilot noticed a "bright green flash inside the cabin" that caused "everything in the cabin [to] light up." A few seconds later, he saw the flash again, this time for a slightly longer period of about two seconds.  The flash caused a glare inside the cabin that made it "difficult to see outside." The pilot realized it was a laser.  He located the spot from which it was being shined at him in what appeared to be a zig zag motion, reported the laser to air traffic control, and continued on to Porterville.

Fresno Police Department pilot Kenneth Schneider and Tactical Flight Officer George Valdez were on duty that night in the department's helicopter, Air-1, and responded to air traffic control's call.  The pair began orbiting the area in which Air George's pilot saw the laser, flying approximately

60 miles per hour at an altitude of 500 feet. During one of the orbits, a green laser hit the cockpit, creating a "big flare" and "light[ing] up the entire cockpit." Schneider and Valdez continued orbiting in order to locate the laser. During that time, the cockpit was struck approximately five or six more times for around three to ten seconds each by a laser moving in a circular motion.

Valdez described the intensity of the flashes as stronger than a camera flash, "brighter than the high beams of a car light by far," and more like staring at the sun. Schneider analogized it to putting a "high-intensity flashlight up to your face and turning it on." Although Valdez experienced disorientation and an "after-image" during and directly after the laser strike, he did not experience any lasting after-image or other physical injury as a result of the strikes. Neither did Schneider. Nevertheless, Valdez testified that the laser interfered with his duties because part of his job is to help the pilot locate and avoid hazards – such as radio towers, other aircraft, and birds – and he was unable to carry out this duty while the laser was hitting the cockpit. Schneider echoed those concerns, stating that being lased impedes a pilot's ability to see his instruments inside the cabin and any hazards outside. He stated that the laser prevented him from scanning his instrument panels and looking out the left side of the aircraft to make sure he kept Valdez on position to spot the laser.

Once Schneider and Valdez pinpointed the laser's location, they directed ground units of the Clovis Police Department to that spot. When Officers Christopher Peters and Steve Cleaver arrived at the location to which Schneider and Valdez had directed them, they saw Rodriguez and his girlfriend Jennifer Coleman standing with several children

and adults outside their apartment. Rodriguez was holding a small cylindrical object in his hand. When Rodriguez saw the officers, he ran towards his apartment. Peters caught him, found the object in his pocket, took it out, and discovered it was a laser. The laser had the following label: "Avoid Exposure Laser / Light is Emitted from this Aperture / Danger / Laser Radiation / Avoid Direct Eye Exposure / Max Output Power < 5 milliwatts / . . . This product complies with 21 C.F.R. / Made in China." Cleaver arrested Rodriguez.

At that point, Coleman told the officers they should release Rodriguez because "she was the one who had the laser and she was the one who was pointing it into the sky." Cleaver separated Coleman from Rodriguez and she repeated that "she was the one who was pointing [the laser] into the sky . . . and that it wasn't her fault that the helicopter flew in front of the laser." Cleaver then arrested Coleman. At that point, Rodriguez "told [Cleaver] that [he] needed to release Ms. Coleman because he [Rodriguez] was the one that was shining the laser at the helicopter."

Cleaver put Rodriguez and Coleman in the back of his patrol vehicle. He then heard Rodriguez tell Coleman "not to say anything else and that if she just told the Court that she was just shining it into the sky, that they would only give her a ticket." Both Rodriguez and Coleman admitted to Cleaver that they "s[aw] the laser reflecting off the helicopter."

Following Rodriguez's and Coleman's arrest, the FBI took over the case. A few weeks later, Coleman called Special Agent Chet Johnston – who was in charge of the investigation – to inquire about the return of property the police had taken the night of her arrest. She and Rodriguez had each received a letter from the Federal Aviation

Authority stating that the agency had determined the couple had not broken any rules and that the matter was closed. She believed the FBI investigation was closed as well. Johnston told her the FAA was a separate entity and had no bearing on the FBI's criminal investigation.

During the ensuing conversation, Coleman told Johnston that on the night in question, she had pointed the laser at the sky multiple times to try to figure out how far the beam would reach. While she pointed it at a tree, it may have struck a helicopter a few times. She said she had been aware there was a police helicopter in the area that night. She also stated that she had allowed her children to play with the laser, instructing them not to point it into anyone's apartment and to only point it into the sky. She apologized to Johnston and said it was "a stupid thing to do." The next day, Johnston met Coleman and Rodriguez at their home. During their conversation, Rodriguez told Johnston that on the night in question, "he pointed the laser at a helicopter. He was aware he struck it approximately four times. He said that he could see and also hear the helicopter as it flew behind a tree, which he was aiming for."

Ultimately, Rodriguez and Coleman were charged with conspiracy to interfere with the safe operation of an aircraft with reckless disregard for human life, 18 U.S.C. § 32(a)(5), (a)(8), two counts of attempting to interfere with the safe operation of an aircraft with reckless disregard for human life, 18 U.S.C. § 32(a)(5), (a)(8), and two counts of aiming a laser pointer at an aircraft, 18 U.S.C. § 39A. At trial, government expert Joshua Hadler, Chief Laser Safety Officer at the National Institute of Standards and Technology, testified that federal regulations prohibit the sale of lasers stronger than five milliwatts. Both he and defense expert

Samuel Goldwasser testified that they tested the laser Rodriguez and Coleman had used and found that it had approximately 65 milliwatts of power. Hadler testified that a laser with that much power could cause after-image, flash blindness, glare, and distraction, and could cause permanent injury to the eye up to around 180 feet. He testified that in order to illuminate the cockpit of a helicopter, a laser beam would have to intersect the cockpit window. He also estimated, based on the laser's power and the altitude of the helicopters, that the laser beam would have had a diameter of three feet when it hit a helicopter at Air-1's elevation on the night of August 25, 2012, and about eleven feet when it hit Air George.

Both Hadler and Goldwasser testified that it would be impossible for even an experienced laser professional to tell the laser was so powerful merely by observing it because "[t]he human eye does not respond very well to measurement of optical power." Hadler testified that about 90 percent of green lasers purchased in the United States are not in compliance with federal regulations because they emit a stronger beam than is allowed. He also testified that the general public lacks awareness of that fact. Government expert Leon McLin, Senior Research Optometrist and Vision Scientist at the Air Force Research Laboratory, testified it would take someone with a steady hand to be able to use a laser to track an aircraft 500 feet up.

Rodriguez did not testify at trial, but Coleman did. She testified that she purchased the laser on Amazon.com for around $7.00 as a toy for her children. She said that as a child, she had played with lasers she bought from ice cream trucks. She said that on the night of August 25, 2012, the couple's two young daughters were playing with the laser,

shining it on the grass, the parking lot, and into other people's apartments. This stopped when two neighbors came out and asked them not to shine the laser into their homes. Coleman put the girls to bed. When she came out of the girls' bedroom about five or six minutes later, she saw a helicopter spotlight outside her apartment, and then saw Officer Cleaver arrest Rodriguez.

Coleman claimed that she did not know the laser beam could reach a helicopter a mile or even a quarter mile away and did not know that pointing the laser at a helicopter could cause unsafe conditions for pilots because it could be dangerous to their eyes. She said she did not know it was against the law for someone to aim a laser at a helicopter. She said she had not read the entire warning label, but acknowledged that she saw it and that she knew the laser was very bright, in part because neighbors had complained about it. She acknowledged she told her children not to point it at anyone's eyes because she knew it could be dangerous. She stated, however, that she did not know the laser was "going-to-kill-you-dangerous, because they sell [lasers] to kids on the ice cream[] [truck, so] how dangerous can [they be]?"

At the end of the government's case and following the close of the defense case, Coleman and Rodriguez moved for judgments of acquittal under Federal Rule of Criminal Procedure 29. They argued that there was insufficient evidence they willfully attempted to interfere with the pilots' operation of the helicopters with reckless disregard for human safety. The court denied the motions.

The jury found both Rodriguez and Coleman guilty of violating § 39A for aiming a laser pointer at Air-1, and Rodriguez, alone, guilty of violating § 32(a)(5), (a)(8), for

willfully attempting to interfere with the safe operations of Air-1 in reckless disregard for human safety.  It acquitted them on all other counts.

On March 10, 2014, the district court sentenced Rodriguez.  Because Rodriguez's two convictions arose from the same conduct, the court grouped them together.  *See* U.S.S.G. §§ 3D1.1–3D1.3.  After finding the intentional endangerment enhancement of U.S.S.G. § 2A5.2(a)(1) applied, the court sentenced Rodriguez to 168 months on his § 32(a)(5), (a)(8) conviction.  The court also imposed a concurrent term of 60 months, the statutory maximum, for the § 39A conviction.  Thus, the total sentence was fourteen years in prison.

Rodriguez appeals his conviction for § 32(a)(5), (a)(8), arguing that the government failed to prove he acted with the requisite mens rea and that we must remand for resentencing on his § 39A conviction because that sentence resulted from his § 32(a)(5), (a)(8) conviction and sentence.

## II.  *JURISDICTION AND STANDARD OF REVIEW*

We have jurisdiction over this appeal under 28 U.S.C. § 1291.  We review the district court's ruling on a defendant's motion for judgment of acquittal de novo.  *United States v. Mendoza*, 244 F.3d 1037, 1042 (9th Cir. 2001).  Evidence offered to support a conviction is sufficient if, when "viewed in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Odom*, 329 F.3d 1032, 1034 (9th Cir. 2003); *see also Jackson v. Virginia*, 443 U.S. 307, 320 (1979).  "[E]vidence is insufficient to support a verdict where mere speculation,

rather than reasonable inference, supports the government's case." *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) (en banc). "[A] 'reasonable' inference is one that is supported by a chain of logic." *Juan H. v. Allen*, 408 F.3d 1262, 1277 (9th Cir. 2005).

## III.    *DISCUSSION*

### A.  The Essential Elements of § 32(a)(5), (a)(8)

Before assessing whether the government presented sufficient evidence to allow a rational factfinder to find Rodriguez guilty of violating § 32(a)(5), (a)(8), we must first identify the essential elements of that statute.  Section 32(a)(5) prohibits "willfully . . . interfer[ing] with or disabl[ing], with intent to endanger the safety of any person or with a reckless disregard for the safety of human life, anyone engaged in the authorized operation of [an] aircraft or any air navigation facility aiding in the navigation of an[] [ ] aircraft." 18 U.S.C. § 32(a)(5).  The aircraft must be "in the special aircraft jurisdiction of the United States or [be] any civil aircraft used, operated, or employed in interstate, overseas, or foreign air commerce."  18 U.S.C. § 32(a)(1). Section 32(a)(8) prohibits attempting to violate § 32(a)(5). 18 U.S.C. § 32(a)(8) (penalizing those who "willfully . . . attempt[] or conspire[] to do anything prohibited under paragraphs (1) through (7) of this subsection").

As the district court properly recognized in its jury instructions, § 32(a)(5), (a)(8) requires proof that 1) the defendant willfully attempted to interfere with or disable a person engaged in the authorized operation of an aircraft or any air navigation facility aiding in the navigation of an aircraft; 2) the defendant intended to endanger the safety of

a person or acted with a reckless disregard for the safety of human life; 3) the aircraft was in the special jurisdiction of the United States or was a civil aircraft used, operated, or employed in interstate commerce; and 4) the defendant took a substantial step toward committing the crime. *See United States v. Meek*, 366 F.3d 705, 720 (9th Cir. 2004) ("[A]n attempt conviction requires evidence that a defendant intended to violate the statute and took a substantial step toward completing the violation." (internal citation and quotation marks omitted)).

As the district court also properly recognized in its instructions, an act is done willfully if a defendant intentionally acted with knowledge that his or her conduct was unlawful. *See, e.g.*, *Bryan v. United States*, 524 U.S. 184, 191–92 (1998) (citing *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)).

A reckless disregard for the safety of human life has both a subjective and an objective component. First, the defendant must be aware of the risk his conduct created (here, that the laser had the ability to blind or distract a pilot enough to cause a crash). *United States v. Trinidad-Aquino*, 259 F.3d 1140, 1145–46 (9th Cir. 2001); *United States v. Albers*, 226 F.3d 989, 994–95 (9th Cir. 2000), *cert. denied*, 531 U.S. 1114 (2001). As the Supreme Court recognized in *Farmer v. Brennan*, "[t]he criminal law[] [ ] generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware." 511 U.S. 825, 836–37 (1994).

Second, the risk must be "'of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that

a law-abiding person would observe in the actor's situation.'" *Albers*, 226 F.3d at 995 (quoting Model Penal Code § 2.02(2)(c) (1985)). To put it succinctly, a defendant acts recklessly when he "deliberately disregard[s] a substantial and unjustifiable risk . . . of which [he is] aware." *Id.*

Having identified the essential elements of a § 32(a)(5), (a)(8) conviction, we next consider whether the government adduced sufficient evidence to allow a rational trier of fact to conclude that Rodriguez acted with the requisite mens rea.

## B. The Government's Evidence

Rodriguez does not dispute that the government adduced sufficient evidence that he intentionally pointed the laser at Air-1. Indeed, he admitted as much to both Officer Cleaver and Special Agent Johnston and he does not appeal his § 39A conviction. He argues, however, that the government did not adduce any evidence that would allow a rational factfinder to conclude either that he was willfully attempting to interfere with the pilot's operation of Air-1 or that he acted in reckless disregard for the safety of human life. The government contends that the evidence that Rodriguez intentionally and repeatedly targeted the cockpit of Air-1, with a light he knew to be dangerously bright is sufficient to allow a rational factfinder to find Rodriguez guilty of violating § 32(a)(5), (a)(8). The government argues that this evidence allows for the rational inference that Rodriguez knew the risk posed to the aircraft by the laser and therefore the finding that Rodriguez both acted with reckless disregard for the safety of human life and must have intended to interfere with the pilot's operation of the aircraft. The main problem with the Government's argument is *Gardenhire*, which was decided

on April 30, 2015, a little over a year after Rodriguez was convicted.

*Gardenhire* involved a defendant's appeal of his sentence following his conviction for violating § 39A by intentionally lasing a Cessna jet and a police helicopter.  Section 39A prohibits "knowingly aim[ing] the beam of a laser pointer at an aircraft in the special aircraft jurisdiction of the United States, or at the flight path of such an aircraft[.]" 18 U.S.C. § 39A(a).  The district court found Gardenhire's intentional conduct in lasing the aircraft showed he had acted recklessly. It applied the reckless endangerment enhancement of U.S.S.G. § 2A5.2(a)(2) to double Gardenhire's base offense level.  *Gardenhire*, 784 F.3d at 1279–80.  We reversed the sentence, holding that "the bare admission that Gardenhire intentionally aimed the laser [at an aircraft], knowing that it was dangerous to shine the laser in someone's eyes, does not support the inference . . . that [Gardenhire] was aware of the dangers to the aircraft from doing so," and therefore could not prove he had the subjective knowledge required for a finding of recklessness. *Id.* at 1283.

The facts the government adduced in *Gardenhire* are almost identical to the facts the government presented at Rodriguez's trial.  Gardenhire, like Rodriguez, admitted to the FBI that he intentionally tried to hit the aircraft with his laser beam. *Id.* at 1280.  The government claimed Gardenhire, like Rodriguez, knew his laser was powerful enough to reach the aircraft. *Id.*  Moreover, Gardenhire, like Rodriguez, knew the laser could be dangerous if shined directly into someone's eyes: his friend had told him "'not to shine the laser at anyone's eyes because it would blind people.'" *Id.* at 1281.  We held that these facts were not clear and convincing evidence Gardenhire had acted recklessly,

concluding that "[t]he record is devoid of evidence . . . that Gardenhire was aware of the risk created by his conduct." *Id.* at 1280.

First, we reasoned, Gardenhire's admission that he intentionally tried to hit the aircraft "does nothing to show that Gardenhire was aware that if he hit the jet, as intended, he could blind or distract the pilot." *Id*. Next, Gardenhire's knowledge that the beam had hit the aircraft "at most [ ] evidences knowledge that he could succeed in striking the jet, not awareness of the *consequences* of the beam strike – the risk that the pilot could be blinded or distracted or the aircraft otherwise endangered." *Id.* at 1281 (emphasis added). Finally, "knowing that a laser beam can cause blindness when pointed directly at a person's eyes is very different than knowing that a laser beam can be distracting to pilots who are both enclosed in a cockpit and at least 2,640 feet away." *Id*. This is because the fact

> [t]hat one knows that the laser is dangerous when pointed directly in a person's eyes does not mean that one knows about the beam's ability to expand and refract, rendering it particularly hazardous for pilots in an aircraft miles away, or that the danger is heightened at nighttime because the pilot's eyes have adjusted to the dark.

*Id.* at 1282.

We then examined other ways the government could have proven Gardenhire was aware of the risk created by his conduct. We looked to *United States v. Naghani*, 361 F.3d 1255, 1263 (9th Cir. 2004), and *United States v. Gonzalez*,

492 F.3d 1031, 1032 (9th Cir. 2007), in which we held the defendants' intentional conduct alone, which caused chaos onboard their respective commercial flights, was sufficient to support a finding of reckless endangerment. We distinguished those cases, however, because Naghani's and Gonzalez's conduct obviously caused a risk of danger that was immediately apparent to them. It was therefore appropriate to find, based on the intentionality of their conduct and the immediate and visible effects of their behavior, that they were aware of the risk their conduct created. *See Gardenhire*, 784 F.3d at 1282 ("Naghani acted in very different circumstances, where the average person would be immediately aware of the consequences of his actions."); *id.* at 1283 ("Gonzalez's actions caused total chaos onboard, supporting the logical inference that he was subjectively aware of the risks of his threatening and violent conduct." (internal quotation marks omitted)).

The *Gardenhire* court held that, in contrast to *Naghani* and *Gonzalez*, it would be inappropriate to conclude merely from Gardenhire's intentional conduct that he was aware of the risk his lasing of the aircraft created because lasers do not operate like normal beams of light. The risk created from the lasing was therefore not immediately apparent to Gardenhire. *See id.* at 1283. As we explained,

> "the farther away [a laser beam] gets from the point of origin, the beam spreads out," thus increasing its hazardousness, a notion that is counterintuitive, especially when one considers that an ordinary light beam would grow fainter. Additionally, the laser pointer is particularly hazardous to an aircraft when the

> beam is refracted off the cockpit glass, which
> intensifies the light even more[.]

*Id.* at 1281 (quoting pilot's testimony).

Because laser beams do not operate like regular beams of light, we held, it would be inappropriate to conclude that Gardenhire must have been aware of the risk created by shining a laser at an aircraft absent a showing that similarly situated defendants, or even average people, understand how laser beams operate. *Id.* at 1283. We noted that, as in the present case, the government had not "submit[ted] any evidence of what even an average person would know about the effects of aiming a laser beam at an aircraft." *Id.* at 1281. For all of these reasons, we concluded, the government failed to show Gardenhire acted recklessly. Rather, in applying the reckless endangerment enhancement, "the district court [ ] made the unsupported leap from deliberate and intentional action to consciousness of risk." *Id*.

Although *Gardenhire* is a sentencing case, its reasoning controls the outcome of Rodriguez's appeal because the facts are almost identical and a finding of recklessness for purposes of the § 2A5.2(a)(2) enhancement, like a finding of recklessness for purposes of § 32(a)(5), requires proof that the defendant is "aware of the risk created by his conduct."[1] *Id.* at 1283. Moreover, as noted, *Gardenhire* did not simply find the evidence insufficient to prove the enhancement applied by clear and convincing evidence. Rather, it held that the record

---

[1] We recognize that *Gardenhire* may be in tension with the First Circuit's decision in *United States v. Sasso*, 695 F.3d 25, 30 (1st Cir. 2012), but we are, of course, obliged to follow our own precedents.

was altogether "*devoid* of evidence."  *Id.* at 1280 (emphasis added).

As in *Gardenhire*, the fact that Rodriguez intentionally shined the laser at the helicopter, although enough for a § 39A charge, is not, in and of itself, sufficient to allow a rational factfinder to conclude that Rodriguez acted with reckless disregard for the safety of human life.  Also as in *Gardenhire*, the government adduced no evidence in Rodriguez's trial showing that the risks posed by lasers are matters of common knowledge.  Indeed, as the government's own expert, Joshua Hadler, testified, it is impossible for even an experienced laser professional to tell a laser's power merely by observing it.  Hadler also testified that the general public is unaware that 90 percent of green lasers imported into the United States are stronger than allowed by federal regulations.  For this reason, Rodriguez's conduct cannot accurately be compared to that of someone who shines a bright spotlight through the windshield of passing cars: the effect of bright lights on automobile drivers at night *is* a matter of common knowledge.

As the government points out, Rodriguez's running from the police when they arrived at his apartment complex, hiding the laser in his pocket, and telling Coleman to say she was only flashing the laser at the sky evidences a consciousness of guilt.  That's true: he *was* guilty of the crime of aiming a laser at an aircraft and had every right to have a guilty conscience.  But his evasive conduct sheds no light, so to speak, on whether he was trying to willfully interfere with the safe operation of the aircraft with a reckless disregard for the safety of human life, as opposed to less serious illegal conduct.

## C. Conclusion

Congress created § 39A in 2011 precisely because it recognized that many people who point lasers at aircraft do not do so with the mens rea required for a § 32(a)(5) conviction. A House Report on the Securing Aircraft Cockpits Against Lasers Act of 2011, the act that created § 39A, stated that

> [s]ome perpetrators [of lasing aircraft] have been charged under 18 U.S.C. § 32, relating to the destruction of aircraft. However, this provision requires the government to prove willful interference and intent to endanger the pilots. While this burden may be easily established when a person attempts to detonate a bomb onboard an aircraft or attempts to overtake a member of the flight crew, *it is difficult to establish this same type of intent for a laser incident, even if the effect is actually to endanger the pilots.* This bill recognizes the obvious and inherent danger of aiming a laser at an aircraft under any circumstance, as long as the offender knowingly aims the laser at the aircraft. The penalty under section 32, 20 years, coupled with having to prove specific intent to interfere with, disable, or endanger the pilots, seems to be a factor in multiple declinations of prosecution under the current statute.

H.R. Rep. No. 112-11, at 2 (2011) (emphasis added).

As is clear from this report, Congress created § 39A to cover situations in which an individual's conduct causes unsafe flying conditions for pilots but prosecutors cannot prove whether that person was intentionally trying to take the aircraft down or whether they even understood the dangers lasers pose to aircraft. Rodriguez's case presents a perfect example of such a situation. His conduct was dangerous and cannot be condoned. He deserves a § 39A conviction and a sentence that reflects the seriousness of his crime. However, his conviction for violating § 32(a)(5), (a)(8) must be vacated. We therefore remand for entry of a judgment of acquittal and we vacate his fourteen-year sentence. In light of *Gardenhire*, and because Rodriguez's statutory-maximum sentence for his § 39A conviction was a result of the court's calculation of his base offense level for § 32(a)(5), (a)(8), a conviction which we have now reversed, we also remand for resentencing on his § 39A conviction.

**REVERSED AND REMANDED.**[2]

---

[2] Rodriguez waived his argument that we should remand his case to a different district court judge by raising it for the first time in his reply brief.